Arthur STEIER, Plaintiff-Appellant,

v.

NEW YORK STATE EDUCATION COM-
MISSIONER, New York City Board of
Higher Education and Brooklyn Col-
lege, Defendants-Appellees.

No. 94, Docket 25270.

United States Court of Appeals
Second Circuit.

Argued Jan. 9, 1959.

Decided Sept. 22, 1959.

Clark, Chief Judge, dissented.

Arthur Steier, pro se.

Joseph F. Gibbons, Asst. Corporation Counsel of City of New York, Brooklyn, N. Y. (George L. Hubbell, Jr., New York City, and Charles H. Tenney, Corporation Counsel, New York City, on the brief), for defendants-appellees New York State Education Commissioner, New York City Board of Higher Education and Brooklyn College.

Before CLARK, Chief Judge, MOORE, Circuit Judge, and GIBSON, District Judge.

GIBSON, District Judge.

Plaintiff brought this action alleging jurisdiction under Title 28 U.S.C.A. § 1343(3). The complaint alleges that plaintiff was maliciously suspended by the Dean of Students of Brooklyn College; that on appeal the President of the College arbitrarily sustained the suspension and that later the Faculty Council of the College, acting upon the recommendation of its Faculty Committee on Orientation and Guidance, unlawfully dismissed plaintiff permanently; that thereafter on appeal for reinstatement to the Board of Higher Education, that Board illegally denied plaintiff's request for a fair hearing and that the State Commissioner of Education refused to reverse the action of the Board and the College, rendering unconstitutional decisions in so doing.

Because of these allegations, plaintiff claims a grievance under the 14th Amendment to the United States Constitution in that he was deprived of his liberty, denied due process, and refused equal protection of the law.

The complaint contains no allegation that he was discriminated against by reason of race, creed, or previous condition of servitude.

The defendants, New York State Education Commissioner (hereinafter called The Commissioner), New York City Board of Higher Education (hereinafter called The Board), and Brooklyn College (hereinafter called The College), in their answers, generally denied plaintiff's allegations and moved to dismiss on the grounds that plaintiff's complaint failed to state a claim against The Board and The College; that the plaintiff had already appealed his dismissal to The Commissioner and had been denied relief, and that the complaint failed to show the deprivation of the plaintiff of any right secured to the plaintiff by the United States Constitution or United States Law. A detailed affidavit was filed with the Motion to Dismiss.

At the trial, Judge Rayfiel treated the Motion to Dismiss as a Motion for Summary Judgment and granted the summary judgment dismissing the complaint. Steier v. New York State Education Commissioner, D.C.E.D.N.Y.1958, 161 F. Supp. 549.

The public colleges of the City of New York, of which Brooklyn College is one, constitute a unit of the public school system of the State of New York. Under Section 6202 of the Education Law of the State of New York, McKinney's Consol. Laws, c. 16, The Board, a body corporate, separate and distinct from the Board of Education of the City of New York, which administers the affairs of the public elementary and secondary school system, is authorized to govern and control those educational institutions in the City which are of collegiate grade. Included among the powers and duties of The Board provided by Section 6202 of said Law is the power to "prescribe conditions of student admission, attendance and discharge." The Board has prescribed such conditions, which, so far as they are here pertinent, are contained in Sections 214a, 216, and 217 of its by-laws. Section 214a provides, *inter alia,* that each student obey all the rules, regulations and orders of the duly established college authorities, and shall conform to the requirements of good manners and good morals.

Section 216 provides that, in the event of the violation of such rules, regulations or requirements, the Dean may reprimand the student involved, suspend him for a period not exceeding one term, or deprive him of certain college privileges. He may also recommend the dismissal of the student, but such disciplinary action may be imposed only by the President, or by the votes of a majority of the members of the Faculty Council. Section 217 provides that the student involved in disciplinary action by the Dean or the Faculty Council may appeal to the President, whose decision is final, except in the case of a dismissal, in which event appeal may be made to The Board.

Under the Education Law, the Education Department of the State of New York is charged with the general management and supervision of all the public schools in the State, and The Commissioner is the chief executive and administrative officer of the Department. Section 310 of said Law provides that in a case such as the instant case a "person conceiving himself aggrieved may appeal or petition to the commissioner of education who is hereby authorized, and required to examine and decide the same, * * * and his decision in such appeals, petitions or proceedings shall be final and conclusive, and not subject to question or review in any place or court whatever."

If one believes the decision of The Commissioner was arbitrary, capricious, or palpably illegal, one may file a petition under Article 78 of the Civil Practice Act of New York in a New York Supreme Court for a review of the decision of The Commissioner. Craig v. Board of Education, 173 Misc. 969, 19 N.Y.S.2d 293, affirmed 262 App.Div. 706, 27 N.Y.S.2d 993; Knapp v. Chisholm, Sup., 144 N.Y. S.2d 191.

To determine whether the United States District Court for the Eastern District of New York had any jurisdiction of this case, we must look at the undisputed facts as contained in the affidavit of Charles A. Brind, Jr., counsel for Commissioner. These facts are not denied by the plaintiff.

Plaintiff entered Brooklyn College in the fall of 1952. He apparently became convinced that certain of the student organizations were too much dominated by the College Administrator. He assumed the role of a reformer. On November 22, 1954, and again on February 24, 1955, he wrote letters to the College President which were obviously bitter and in one of which intemperate language was directed against the office of Student Administration of The College. On March 3, 1955, as a result of these two letters, the Dean of Students suspended the plaintiff for the remainder of the term. In his letter of suspension the Dean quoted a by-law of the Board of Higher Education which reads as follows:

"S. 155, a—Student Discipline.

"Each student enrolled in any college or school under the control of the Board of Higher Education and every organization, association, publication, club or chapter shall obey all the rules and regulations and orders of the duly established college authorities, shall give punctual and courteous attention to all college duties, shall use the property of the institution with care and economy, shall conform to the requirements of good manners and good morals, and shall obey the laws of the City, State, and Nation within college grounds and elsewhere."

Plaintiff appealed this suspension to the College President—to no avail. However, on August 2, 1955, plaintiff applied in writing for readmission. On September 7th a conference was held between plaintiff, his mother, the Dean and a Professor, and on that day plaintiff wrote a letter to the Dean reiterating his mistake of undignified manner of expression in the letters which caused his suspension and generally promised if reinstated to abide by the rules and regulations and to generally have a change of spirit.

As a result of the conference and his letter, on September 17, 1955, the Dean unblocked his registration, but stipulated that during the coming year plaintiff could not participate as an officer in any student activity organization, and also warned plaintiff that The College would take a serious view of any violation of the letter or spirit of the understanding as outlined in plaintiff's letter of September 7th. In January, 1956, plaintiff received a warning from the Dean that in the Dean's opinion plaintiff was not keeping the agreement leading to plaintiff's reinstatement.

In June, 1956, after the academic year was completed, the Dean wrote the plaintiff that though still showing deficiencies, plaintiff had made certain gains. However, plaintiff was notified that during the fall term of 1956 he could not hold office or membership in any student organizations.

Plaintiff caused to be published in the first issue of the College paper, dated September 20, 1956, the story of his latest probation—claiming the probation was caused by the discriminatory and vindictive policies of the College Administration. On September 21st plaintiff was suspended for the second time as of September 24th because of his "continued disregard of the rules and regulations."

Plaintiff and his parents promptly appealed this second suspension to the College President—again to no avail. In December plaintiff applied for reinstatement. As a result he was asked to appear before the Faculty Committee on Orientation and Guidance. This he did. This Faculty Committee unanimously recommended plaintiff's dismissal for the following reasons:

1. In spite of the fact that Mr. Steier knew he was not to appear on campus during his suspension he

   a. was seen in Boylan Hall placing leaflets in staff and stuent mail boxes on December 4th. (Dean Coulton's letter to Dean Stroup dated December 6, 1956.)

b. entered the Executive Council Meeting and refused to leave on October 17. (Mr. Beesley's letter to Dean Coulton dated October 18, 1956.)

c. on the same day (Mr. Pedersen's note to Dean Stroup received on October 23, 1956) Mr. Pedersen writes: "I obtained the services of a patrolman who escorted Mr. Steier out of the meeting."

2. Mr. Steier has used abusive language in letters written to College officials.

a. In his letter of November 19, 1956, to Dean Stroup he wrote: "I can come to no other conclusion, therefore, but that you may have committed a deliberate, and malicious lie."

b. Again in a letter to President Gideonse on November 22, 1956, he wrote "Those students, however, who place conscience above their graduate school recommendations and permanent record cards do have the gumption to protest such vile indecencies as have been displayed by your Office of Student Activities."

3. In spite of the clear restrictions placed on Mr. Steier's co-curricular activities for the period September 1956 until June 1957, he was in attendance at the Students for Campus Democracy booth of the Club Fair on September 19, 1956. (Dean Coulton's note to Dean Stroup dated September 19, 1956.)

4. There is no indication that Mr. Steier understands that his behavior is inappropriate.

a. He writes, "I make no apologies for having appeared on the Brooklyn College campus since my suspension for what I feel to be legitimate reasons." (Mr. Steier's six page paper of December 4, 1956, page 6.)

b. In the same paper (Mr. Steier's six page paper of December 4, 1956, page 1) he says: "And if my 'willingness to cooperate with college authorities' means turning my back on this fight, then I question both the legal and the moral right of a public official to issue such an 'injunction.'"

On December 20th plaintiff was notified that the Faculty Council approved the recommendation of the Faculty Committee and that he was dismissed.

Plaintiff then appealed—in accordance with New York Law and the rules and regulations of the Board of Education—to that Board. After a hearing, this appeal was denied and he thereafter appealed to the Commissioner of Education of New York. After a hearing, this appeal was denied. Thereafter this action was started.

The protection to citizens of the United States by the "privileges and immunities" clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

The "privilege" of attending The College as a student comes not from federal sources but is given by the State. Hamilton v. Regents of University of California, 293 U.S. 245, 261, 55 S.Ct. 197, 79 L.Ed. 343.

In the case of University of Maryland v. Coale, 165 Md. 224, 167 A. 54, the Court of Appeals of Maryland held that the University could suspend students who refused to take the regular course in military training, though their refus-

al was based on conscientious religious conviction. The Appeals Court there held such action of the President and Regents of the University was not in contravention of the Fourteenth Amendment of the United States Constitution. When this case was sought to be appealed to the United States Supreme Court, jurisdictional statements were submitted. The United States Supreme Court dismissed this appeal for the want of a substantial federal question. See Coale v. Pearson, 290 U.S. 597, 54 S.Ct. 131, 78 L.Ed. 525.

And in State ex rel. Steinle v. Faust, 55 Ohio App. 370, 9 N.E.2d 912, at page 914, the Ohio Appellate Court ruled that education is purely a matter of state concern, and no rights, powers or duties concerning it have been either expressly or impliedly granted to the Federal Government within the limitations of the Tenth Amendment to the Constitution of the United States.

The Education Law of New York and the rules and regulations promulgated by virtue of it were strictly followed. These have been held to be constitutional by the New York Court. See Barringer v. Powell, 230 N.Y. 37, 128 N.E. 910; Bullock v. Cooley, 225 N.Y. 566, 122 N.E. 630.

Copies of all documents filed by The Board, including charges made against the plaintiff by The College, were served upon him. He filed numerous documents and exhibits in his own behalf. He argued his appeals orally. At the hearing before The Commissioner, he was afforded the same rights and privileges as were available to The Board—all as prescribed by the rules.

Judge Rayfiel, in his opinion, quoted aptly from two pertinent New York State cases—as follows:

"In the case of Bean v. Wilson, 200 Misc. 183, 108 N.Y.S.2d 939, at page 942, affirmed 279 App.Div. 277, 110 N.Y.S.2d 94, the Court said, 'The Commissioner is authorized and required to examine and decide appeals and petitions by persons con-

ceiving themselves aggrieved * * * and his decision in such appeals, petitions and proceedings is final and conclusive and not subject to question or review in any place or court whatever, Education Law, § 310; People ex rel. Board of Education etc. v. Graves, 243 N.Y. 204, 153 N.E. 49; Barringer v. Powell, 230 N.Y. 37, 128 N.E. 910; People ex rel. Hylan v. Finegan, 227 N.Y. 219, 125 N.E. 97; Bullock v. Cooley, 225 N.Y. 566, 122 N.E. 630; People ex rel. Jennings v. Finley, 175 App.Div. 204, 161 N.Y.S. 817, except when it is shown purely to have been arbitrary or palpably illegal.'

"In the proceeding: O'Brien v. Commissioner of Education of the State of New York, 4 N.Y.2d 140, 173 N.Y.S.2d 265, 149 N.E.2d 705, decided March 26, 1958, the Court of Appeals of the State of New York, in passing upon an appeal, brought on alleged constitutional grounds, seeking to annul a decision of the Commissioner, said: 'The Commissioner of Education held a hearing at which, though no one was called to testify or give evidence, an opportunity was accorded for full oral argument, the submission and exchange of briefs and the filing of any and all affidavits, exhibits and other materials the parties desired.' The Court further said: 'Quite obviously, and we recently so held in a case very similar to the present one, the Commissioner of Education's resolution of a dispute on conflicting affidavits without an oral hearing neither directly involves the construction of the constitution nor poses a constitutional question of any kind. (See Kuhn v. Com'r of Education, 2 N.Y.2d 749, 157 N.Y.S.2d 383, 138 N.E.2d 742.)'" [161 F.Supp. 552.]

While it may well be that the remedy provided the plaintiff under Article 78 of the New York Civil Practice Act is an administrative remedy available to the plaintiff, and one that he has not exhausted, and therefore this action is im-

properly brought (see Baron v. O'Sullivan, 3 Cir., 258 F.2d 336, 337), we prefer to place our decision squarely on the ground that the complaint and uncontroverted facts clearly demonstrate there was no jurisdiction in the United States District Court.

Here we have a student who was suspended. He was then taken back at his request on certain terms. Thus, in effect, he was on probation. The College felt he violated his probation and dismissed him—for its own reasons.

Education is a field of life reserved to the individual states. The only restriction the Federal Government imposes is that in their educational program no state may discriminate against an individual because of race, color or creed.

As so well stated by Judge Wyzanski in Cranney v. Trustees of Boston University, D.C., 139 F.Supp. 130, to expand the Civil Rights Statute so as to embrace every constitutional claim such as here made would in fact bring within the initial jurisdiction of the United States District Courts that vast array of controversies which have heretofore been raised in state tribunals by challenges founded upon the 14th Amendment to the United States Constitution. It would be arrogating to United States District Courts that which is purely a State Court function. Conceivably every State College student, upon dismissal from such college, could rush to a Federal Judge seeking review of the dismissal.

It is contrary to the Federal nature of our system—contrary to the concept of the relative places of State and Federal Courts.

Whether or not we would have acted as did the Administrator of Brooklyn College in dismissing the plaintiff matters not. For a Federal District Court to take jurisdiction of a case such as this would lead to confusion and chaos in the entire field of jurisprudence in the states and in the United States.

The judgment dismissing the complaint is affirmed on the ground that the United States District Court lacked jurisdiction over this matter.

MOORE, Circuit Judge (concurring in the result).

Although I agree with Judge Gibson that the order appealed from should be affirmed, I do not believe that the district court lacked jurisdiction. It is also my view that summary judgment was properly granted in favor of defendants because the record before Judge Rayfiel reveals no material issue of fact requiring a trial.

Plaintiff brought his action under 28 U.S.C.A. § 1343(3), which provides as follows:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*    \*    \*    \*    \*

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; \* \* \*".

In a highly adverbial[1] complaint, plaintiff sought relief in the District Court under the Fourteenth Amendment of the United States Constitution, placing his grievances within the categories of "Deprivation of Liberty," "Denial of Due Process" and "Refusal of Equal Protection." He alleged that he had been unconstitutionally dismissed as a student of Brooklyn College by public authorities in violation of this Amendment. He sought the aid of the Federal Courts to reinstate him as a student or to force the Faculty Council of Brooklyn College to give him what he calls "a trial, incor-

---

[1]. "maliciously suspended," "arbitrarily sustained," "unlawfully dismissed," "unreasonably insufficient," "unconstitutionally dismissed."

porating adequate procedural safeguards." The three defendants are New York State Education Commissioner (Commissioner), New York City Board of Higher Education (Board), and Brooklyn College (College). Defendants Board and College answered the complaint. The Commissioner moved to dismiss the action for lack of jurisdiction over the subject matter. Board and College joined in the Commissioner's motion and moved to dismiss the complaint on the additional grounds that it did not state a claim and that it failed to show a deprivation under color of any State law, statute, ordinance, regulation, custom or usage by the Board and College of any right, privilege or immunity secured to plaintiff by the Constitution of the United States, or by any act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States,

Attached to the Commissioner's motion were documents and affidavits which disclosed the material facts relating to plaintiff's alleged grievances, the many hearings granted to plaintiff, the decisions thereon, and the evidence in support thereof. Having this mass of material before him, the trial court quite properly turned the motion into one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. and granted judgment dismissing the complaint.

Plaintiff has, in substance, alleged that he has been deprived, under color of the Education Law of New York State and the by-laws of the Board of Higher Education, of various rights secured to him by the Fourteenth Amendment; that he was denied the equal protection of the laws when dismissed from Brooklyn College through a malicious, arbitrary and unreasonable construction and application of the by-law requiring that students "shall conform to the requirements of good manners and good morals * * *"; and that he was deprived of his right to public education without due process of law, in that during his various interviews and hearings he did not enjoy the right to cross-examine witnesses, object to the admissibility of evidence, and the other procedural safeguards guaranteed to defendants in criminal prosecutions. He also claimed that his right of free speech had been impaired.

While it is true that the Fourteenth Amendment protects individuals against State action which constitutes a purposeful discrimination not based on a permissible classification, the record reveals no such discrimination in this case. The officers of Brooklyn College dismissed plaintiff in furtherance of a policy reasonably calculated to advance a legitimate interest of the State. It was the duty of the College Administration to maintain discipline and an atmosphere conducive to learning. Plaintiff's overzealous campaign for the causes which he espoused must have had a disruptive effect on the environment of both student body and faculty. It was, therefore, incumbent upon the Administration to concern itself with plaintiff's activities as they affected the welfare of the College as a whole. When he persisted in his agitating behavior after suspension and reinstatement it was not so unreasonable to dismiss him that deprivation of constitutional rights resulted. Broad discretion as to disciplinary matters must be vested in a college faculty and the administrative officers. If every time a student were suspended for some misconduct such as, for example, overuse of alcoholic beverages or wilful overcutting of classes, he were able to avoid the imposition of the penalty by saying, "Why suspend me? There are others just as bad," chaos would reign on the campus.

One of the difficulties here is that plaintiff, a young man and not a lawyer, prosecutes this case *pro se*, with the aid of quotations and highsounding phrases which have very little to do, if anything, with the facts or legal issues in this case. He believes that his "rights" must be vindicated regardless of the rights of others, that he alone, in contrast to those entrusted by law with the administration of education in Brooklyn College and the City and State of New York, is right

and that they are wrong in their administrative policies. Plaintiff was one student out of some 8,000 at Brooklyn College but he insists that his views and his practices prevail and that he be allowed to continue them unrestrained lest the Fourteenth Amendment be violated.

As a member of the student body, he envisions himself as deprived of liberty in that the administration did not look with favor upon his writing letters to them, accusing them, among other things, of "vile indecencies." Despite the fact that he was receiving his education without cost at the hands of the taxpayers of his community and that he entered Brooklyn College not as a matter of right but as a matter of grace after having agreed to conform to its rules and regulations, he regards himself deprived of free speech, holding himself free to write or say what he chooses, subject only to the risk of civil or criminal libel and slander. Such redress, he says, must be by the individual recipient of his abuse, and cannot be considered as a breach of good morals or good manners by the College.

In the category of "Denial of Due Process," he would turn every College or committee review of his acts into a full scale criminal trial with bills of particulars, cross examinations, and discovery proceedings. Despite the fact that, throughout his college career, he was given more than tolerant consideration by the representatives of the various defendants, many oral hearings, more than adequate notice of the charges against him and the bases upon which the College alleged his violation thereof, he charges denial of due process. He argues that he was unaware of the nature of his misconduct despite the fact that he was specifically told wherein his acts departed from good manners and good morals in the academic community. Plaintiff knew what was required of him, yet after two suspensions and two reinstatements upon his own assurances of compliance, he persisted in his conduct. Dismissal ultimately resulted.

When plaintiff entered Brooklyn College, he was required to sign a pledge which, amongst other paragraphs, contained the following:

"I shall conform with the discipline, regulations, and orders of the College of the City of New York, and with the by-laws and resolutions of the Board of Higher Education of the City of New York."

One of the primary functions of a liberal education to prepare the student to enter a society based upon principles of law and order may well be the teaching of "good manners and good morals." Defiance by plaintiff of these standards by wholesale broadcasting of his personal views amongst the student body and faculty was scarcely compatible with these precepts. He deliberately chose not to conform with his pledge. The instances are many but a few may be culled from the record as illustrative.

At the time of his first suspension in the Spring of 1955, his academic work was substantially below standard, namely, minus 19 according to the system employed at the College. When he was permitted to resume his studies in the Fall of 1955, he was reinstated on a probationary basis, one of the conditions being non-participation as an officer in any student activities organization. The suggestion was made to plaintiff that he concentrate his full time and energy upon his primary academic tasks. Such a condition was consistent with the universal practice in American colleges and universities where certain academic standards are required for participation in extra-curricular student activities and in college athletics. Were plaintiff's views to prevail, every athlete, disgruntled at the faculty's decision to place him on probation for academic reasons, could immediately apply to the courts for relief and to avoid deprivation of liberty, due process and equal protection of the laws, could have a full-scale trial in which he could cross-examine all his professors as to their individual malice toward him and their arbitrary conduct in their decision that he merited a "D" instead of

a "B plus." Were he to properly present his case, he should also call all his fellow students who received "B pluses" so as to establish to the court that his examination papers were just as good as theirs and, hence, that there was discrimination and lack of equal protection.

Another instance is plaintiff's claim to the right to attend a meeting of the Student Executive Council. Plaintiff was not a member of the Executive Council and had no right to be there and, upon his refusal to leave, had to be escorted out by a police officer. Since he had no right to be present, he can scarcely found a deprivation of liberty charge upon this incident any more than he could walk into a meeting of the Cabinet of the United States and charge a similar deprivation were he not allowed to participate in its deliberations.

By the distribution of literature to the faculty and student body of the College, containing charges against the administration, faculty and its committees, plaintiff's actions were, to say the least, disruptive and an interference with the atmosphere which should prevail in an institution of higher education. If plaintiff's views were to prevail, the judiciary law should be amended to give any student who has been the subject of disciplinary action by the Dean's Office or the President's Office of any college or university a direct appeal to the Supreme Court. By such a procedure, countless hours of time of faculty, administrative officers, and lower courts would be conserved.

Jurisdiction exists in the Federal Courts (Hamilton v. Regents of University of California, 1934, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343), but neither on the law nor the facts has plaintiff made out a case.

Plaintiff argues that a rule which is fair on its face may be discriminatorily applied so as to deny to an individual the equal protection of the laws, as in Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. A necessary element of a claim so founded, however, is proof of an "intentional or purposeful

discrimination between persons or classes." Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Spampinato v. M. Breger & Co., Inc., 2 Cir., 1959, 270 F.2d 46. Although plaintiff alleged in his complaint that other students at Brooklyn College had also publicly criticized the Administration, and the record shows that critical statements by others did appear in the Kingsman, a student newspaper, and that no other students were dismissed, as he was, there is nothing to suggest that any other student so persistently disturbed the college community. The record supports an inference that any equally disruptive student would have been dismissed.

The equal protection cases cited by plaintiff are not apposite, as the trial court held, since they involved either an expressed impermissible classification, such as one based on race or religion, or the impermissibly discriminatory application of a rule fair on its face.

Plaintiff's claim of an alleged denial of procedural due process in the administrative hearings wherein his dismissal was reviewed is faulty in that the Fourteenth Amendment does not guarantee judicial due process in such administrative proceedings, O'Brien v. Commissioner of Education, 1958, 4 N.Y.2d 140, 173 N.Y.S. 2d 265, 149 N.E.2d 705, and the record does not suggest a fundamental lack of fairness in the hearings.

As to plaintiff's reliance on his right of free speech, it has not been impaired. He may still speak and write as he wishes, subject to the law of libel and slander, the clear and present danger doctrine, and other restraints imposed upon every individual.

Judge Rayfiel was correct in granting the motion to dismiss the complaint as though it had been made for summary judgment under Rule 56, Federal Rules of Civil Procedure, not because the district court lacked jurisdiction, nor because plaintiff had not exhausted state remedies, but because the pleadings and other documents before him revealed no material issue of fact which required a trial.

The judgment dismissing the complaint should be affirmed.

CLARK, Chief Judge (dissenting).

I cannot agree with any of the several mutually exclusive and conflicting reasons advanced to justify the dismissal of this action. For I believe the plaintiff has presented claims which can be legally adjudicated only upon a full dress trial in the district court. The reasons here set forth range from assertions of lack of jurisdiction and failure to exhaust state remedies—defenses quite unavailable under the precedents—to a selective and highly colored judicial reconstruction of facts, of which many were not even claimed by any of the defendants and in any event are unacceptable until proved at trial. However much we may try to evade it, the fact remains that the case is before us with too important and far-reaching issues to be merely pushed aside. In justice to the parties and to the vital public interest in education here involved I am convinced that the action should not be peremptorily dismissed.

Suing under the Civil Rights Statute, 28 U.S.C. § 1343(3), Arthur Steier has alleged that the Dean of Students and the President of Brooklyn College—a unit of the public education system of the City of New York—arbitrarily and maliciously caused him to be first suspended and then dismissed from the College for misconduct. Thus he is barred from further public education in the State of New York. There can be no dispute that on defendants' motion for summary judgment below Steier made a prima facie documentary showing to support his allegations, leaving open only the question whether they are adequate to justify the relief sought. Steier's several letters, on which the College's action is purportedly based, show perhaps an obstinate and overstated sense of indignation against student discrimination, but nothing indecent, delinquent, or criminal and nothing (I submit) calling for discipline and expulsion, rather than patient response. So my brother Judge Gibson, construing the record as favorably as possible to the defendants, nevertheless is brought to the reluctant conclusion that the College dismissed Steier "for its own reasons." True, my brother Judge Moore, by items carefully culled from the voluminous correspondence submitted by the defendants on their motion to dismiss, has attempted to show both misconduct and scholastic difficulties on the part of Steier. But there appears to have been no actual scholastic deficiency, and it needs emphasis that the College never at any time based its attempted discipline on scholastic deficiencies; nor do the defendants now make any such claim.[1] So the details selected to show misconduct (which of course stand unproven) really only demonstrate the more that Steier's vice is nonconformity, rather than crime or misdemeanor. Surely the City's public education system has failed in its purpose when for its own assumed self-protection it must deny all its benefits to one whose only apparent transgression is a persistent and even irritating spirit of independence.

The district court based its ruling on plaintiff's failure to exhaust state remedies. As the weight of authority is clearly against such a holding, I do not belabor that issue. See, e. g., Borders v. Rippy, 5 Cif., 247 F.2d 268, 271, and cases there cited. The main opinion herein, however, I find considerably more distressing. It is bottomed solely on the proposition that "Education is a field of life reserved to the individual states. The only

---

[1] Actually plaintiff's grades (which the concurring opinion cites at their lowest point in his college career) appear to have been generally of "C" level and quite above disciplinary action. So other assumed facts seem equally doubtful. Thus plaintiff says that the Student Executive Council meeting he attended was an open one, with many other nonmember students in attendance, and that there was no reason to order the police officer to accompany him out. The concurring opinion appears to claim for university deans powers of dismissal and discipline of nonconforming students which I know from personal experience such officials in general do not seek or desire.

restriction the Federal Government imposes is that in their educational program no state may discriminate against an individual because of race, color or creed."[2] This indeed is a novel doctrine. No court, ever before to my knowledge, has suggested that the Fourteenth Amendment to the United States Constitution is a paltry piece of class legislation limited, it seems, to according protection to Negroes in the South and Jehovah's Witnesses in other areas. Surely the noble privileges therein embodied are not to be thus denigrated.

Speaking specifically of the opportunity for education, the Supreme Court has declared that "where the state has undertaken to provide it, [it] is a right which must be made available to *all* on equal terms." Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180 (emphasis added). That the Supreme Court's—and the Fourteenth Amendment's—"all" does not mean merely "minority groups" is clear. White as well as Negro students may properly object to public school segregation—and under the civil rights statute, too. Romero v. Weakley, 9 Cir., 226 F.2d 399.

It cannot be really gainsaid at this late date that the Fourteenth Amendment broadly requires of the states in all their activities that they make *only reasonable* distinctions between persons. Goesaert v. Cleary, 335 U.S. 464, 466, 69 S.Ct. 198, 93 L.Ed. 163. See also Douglas v. Noble, 261 U.S. 165, 168, 43 S.Ct. 303, 67 L.Ed. 590; Dent v. State of West Virginia, 129 U.S. 114, 123–124, 9 S.Ct. 231, 32 L.Ed. 623; Nebbia v. People of State of New York, 291 U.S. 502, 524, 54 S.Ct. 505, 78 L.Ed. 940; Quaker City Cab Co. v. Commonwealth of Pennsylvania, 277 U.S. 389, 400, id. 403, 406 (dissent of Brandeis, J.), 48 S. Ct. 553, at page 556, 72 L.Ed. 927; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369; Ex parte Secombe, 19 How. 9, 13, 60 U.S. 9, 13, 15 L.Ed. 565.

"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. * * * Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." Yick Wo v. Hopkins, 118 U.S. 356, 370, 373–374, 6 S.Ct. 1064, 1071, 30 L.Ed. 220.

Even in as delicate an area as the assessment of the character of applicants for admission to the bar of a state's courts, a state may be made to defend the reasonableness of its action in the federal courts. Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. This court has recognized the right of a teacher, newly hired, on probation, and without tenure, to test under the Civil Rights Statute the reasonableness of her dismissal from employment. Bomar v. Keyes, 2 Cir., 162 F.2d 136, certiorari denied 332 U.S. 825, 68 S.Ct. 166, 92 L. Ed. 400. And the same statute has been utilized to challenge the grounds of a student's expulsion for insubordination even in advance of an actual expulsion and when the school authorities had merely announced a prospective policy. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. Plaintiff's position here is indistinguishable from the above. He should be given an opportunity to prove the serious charges he has made. The claimed defenses of law are legally insufficient, and the attempted reconstruction of the merits needs proof at trial before it can be viable. Hence I would reverse and remand for trial.

---

2. The concurring opinion goes so far as to say that the public education here involved is a matter of grace, not right.