## JONES v. STATE BOARD OF EDUCATION OF TENNESSEE ET AL.

No. 731.   Argued January 19–20, 1970—Decided February 24, 1970

*Reber F. Boult, Jr.,* argued the cause for petitioner. With him on the briefs were *Charles Morgan, Jr., Richard Bellman, Melvin L. Wulf,* and *Eleanor H. Norton.*

*Robert H. Roberts,* Assistant Attorney General of Tennessee, argued the cause for respondents.   With him on the brief were *David M. Pack,* Attorney General, and *Thomas E. Fox,* Deputy Attorney General.

PER CURIAM.

Petitioner Jones was suspended indefinitely as a student at Tennessee A. & I. State University in the summer of 1967.   His indefinite suspension was confirmed after a hearing in September of that year, in which charges against him were specified, evidence taken, and findings made.   He, along with two other suspended students, brought suit in the United States District Court for the Middle District of Tennessee, seeking to set aside the suspension on First Amendment and due process grounds. After a hearing, the District Court granted judgment on the merits to defendants with an opinion.   279 F. Supp.

190 (1968). On appeal the Court of Appeals for the Sixth Circuit affirmed. 407 F. 2d 834 (1969). We granted certiorari, 396 U. S. 817 (1969), primarily to consider the issues raised by Jones' claim that he had been separated from the university solely because of his distribution of leaflets urging a boycott of fall registration.

After oral argument, and on closer review of the record, it emerges—as it did not from the certiorari papers or the opinions of the District Court and the Court of Appeals—that Jones' indefinite suspension was based in part on a finding that he lied at the hearing on the charges against him. This fact sufficiently clouds the record to render the case an inappropriate vehicle for this Court's first decision on the extent of First Amendment restrictions upon the power of state universities to expel or indefinitely suspend students for the expression of views alleged to be disruptive of the good order of the campus. Accordingly the writ of certiorari is dismissed as improvidently granted.

*It is so ordered.*

MR. JUSTICE BLACK, for reasons set out in the above opinion and others stated in his dissent in *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 515–526, would affirm the judgment below.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

Petitioner, a student at Tennessee A. & I. State University, was dismissed from the school on charges preferred by a Faculty Advisory Committee and heard by it. One of the charges read as follows:

"You are charged with distributing literature and soliciting students, all of which was designed to

boycott the registration at the University for the Fall Quarter 1967. This occurred during the Summer of 1967."

The literature urging a boycott of registration was a pamphlet which is printed in the Appendix to this opinion.

Petitioner, being suspended indefinitely, brought this suit in the District Court for an injunction and other relief. That court denied relief, 279 F. Supp. 190, and the Court of Appeals affirmed. 407 F. 2d 834. Our failure to reverse is a serious setback for First Amendment rights in a troubled field.

The leaflet now censored may be ill-tempered and in bad taste. But we recognized in *Terminiello* v. *Chicago,* 337 U. S. 1, that even strongly abusive utterances or publications, not merely polished and urbane pronouncements of dignified people, enjoy First Amendment protection. We said in *Terminiello:*

> "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Id.,* at 4.

Students are certainly entitled to enjoy First Amendment rights. *West Virginia* v. *Barnette,* 319 U. S. 624, 637; *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250. This does not mean that free speech can be used with impunity as an excuse to break up classrooms, to destroy the quiet and decorum of convocations, or to bar the constitutional privileges of others to meet together in

34

matters of common concern. But the campus, where this leaflet was distributed, is a fitting place for the dissemination of a wide spectrum of ideas.

Moreover, it is far too late to suggest that since attendance at a state university is a "privilege," not a "right," there are no constitutional barriers to summary withdrawal of the "privilege." Such labeling does not resolve constitutional questions, as we recently noted in *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6. The doctrine that a government, state or federal, may not grant a benefit or privilege on conditions requiring the recipient to relinquish his constitutional rights is now well established. *E. g., Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 894; *Sherbert* v. *Verner,* 374 U. S. 398, 404; *Speiser* v. *Randall,* 357 U. S. 513, 519–520; *Garrity* v. *New Jersey,* 385 U. S. 493, 499–500; *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 597–598; *Frost & Frost Trucking Co.* v. *Railroad Comm'n,* 271 U. S. 583, 593–594; see Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439, 1445–1454 (1968); Comment, Another Look at Unconstitutional Conditions, 117 U. Pa. L. Rev. 144 (1968). As stated in *Homer* v. *Richmond,* 292 F. 2d 719, 722:

> "One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law."

This does not mean that the whole panoply of the Bill of Rights is applicable to student dismissal proceedings. It does mean, however, that where there are "constitutional restraints upon state and federal governments" in dealing with the persons subject to their supervision, the persons in question have "a constitutional right to notice and a hearing before they can be removed." *Cafeteria Workers* v. *McElroy, supra,* at 898.

Judge Rives, speaking for the Court of Appeals for the Fifth Circuit, stated in *Dixon* v. *Alabama State Board,* 294 F. 2d 150, 157: "[No] one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value." Judge Rives went on to hold that such "privilege" or "right" could not be taken away without notice and hearing. *Id.,* at 158. Thus the dissent of Judge Clark in *Steier* v. *New York State Education Comm'r,* 271 F. 2d 13, 22–23, became the law. See Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027, 1028–1034 (1969).

When we look at the present proceeding we learn that there was notice and that there were hearings. The charge was circulating the leaflet, which clearly was a First Amendment right. As we said in *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 506:

> "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years."

At the very least the suspension raises a serious constitutional question in the absence of provision for a timely judicial determination of the First Amendment claims. Cf. *Freedman* v. *Maryland,* 380 U. S. 51.

The circulation did not disrupt a classroom or any other university function. It would seem, therefore, that it is immune from punishment, censorship, and any form of retaliatory action.

"Neither the state in general, nor the state university in particular, is free to prohibit any kind of expression

because it does not like what is being said." Wright, *supra,* at 1039.

The suspension of petitioner was based in part on distributing the literature and in part on the committee's conclusion that, when petitioner at the hearing denied that he "passed out such literature," he "did not tell the truth."

But lying to school authorities was no part of the charges leveled against petitioner. If he is to be expelled for lying, he is entitled to notice and opportunity to be heard on that charge. We said in a case involving the disbarment of a lawyer, "The charge must be known before the proceedings commence." *In re Ruffalo,* 390 U. S. 544, 551. In that case one of the grounds of disbarment was petitioner's employment of one Orlando as an investigator. That was not included in any charge made prior to the disbarment hearing. Petitioner was not aware that it would be considered as a disbarment offense until after both he and Orlando testified on all aspects of that phase of the case. We said that disbarment proceedings

> "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh.
>
> "How the charge would have been met had it been originally included in those leveled against petitioner . . . no one knows.
>
> "This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process." *Id.,* at 551–552.

Procedural due process in the present case requires that if petitioner is to be deprived of an education at Tennessee A. & I. for lying, he be given notice of that precise charge and an opportunity to be heard.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

"In the early years of the civil rights movement in America, college students in Nashville's black universities were in the forefront of the struggle. Today, a new vanguard has formed and once again, students at Tennessee State University are called to the helm.

"The great white fathers downtown have given the ultimatum to the administrators of this school. They've begun the conspiracy to seize total control of the puppet administrators and the entire student body. For their own security, and in the vested interest of the MAN, the Juda administration has sold out the student body by directing the following atrocities against us:

"1. Students whose names appeared in the Nashville rags—namely the Banner and the Tennessean—in connection with the April 'disturbances' have been dismissed from this university without pre-warning of their dismissal, and without the opportunity to appear before the student senate to hear the charges brought against them, and to appeal their cases.

"COMMENT: If the puppets want to adopt the uncivilized tactics used by the MAN, we must move to correct these erroneously acting, educated TOMS.

"2. Legislation has been taken to decrease the number of out-of-state students by increasing out-of-state fees, and adopting rigid academic standards.

"COMMENT: The puppet fools have taken this action to remove academic freedom, and student dissent from university life. Thus they secure their own shaky jobs, and their positions in the circus of white man's society. These people are too blind to see that the MAN initiated these moves so that he may 'morally' proceed to infiltrate our black

university with his teachers and students who are more adept in perpetuating his culture than the puppets who are already here.

"3. Non-city students have been required to move on campus with an increase in dormitory fees.

"COMMENT: Thus the campus will become a concentration camp controlled and contained by the legislation of the *racist dogs* downtown, the acts of the *puppet administrators,* the billy clubs and guns of *Nashville's racist cops,* and ultimately the gestapo tactics of the *honorable national guard,* whose pale faces have already been seen in Memphis, Nashville, Chattanooga.

"No longer can we as intelligent human beings allow others to make a charade of democratic principle by submitting to the tyranny of a dictatorial administration. Let it be resolved that . . .

"1. We as students of this university will not allow ourselves to be herded into concentration camps disguised as the 'university campus.'

"2. We, as intelligent black students, will not be guarded by trembling, powerless idiots who call themselves administrators.

"3. We, as black human beings will not be recorded in the pages of history as an ununified race of people, exterminated by the guns of submission and hate.

"A generation of inactivity has given today's black students [a] responsibility of informing and uniting our fellow classmates so that we can fight to remove the injustices directed against us as black people.

"CAST YOUR VOTE FOR *STUDENT POWER ! ! !* BOYCOTT REGISTRATION SEPTEMBER 23 AND FOR AS LONG AS THE PUPPET ADMINISTRATION REFUSES TO ACKNOWLEDGE THAT THIS IS *OUR* UNIVERSITY!                    SNCC."