Patrick M. HASSON, a minor, Joseph M. Hickey, Jr., a minor, and Robert F. Wheaton, Jr., a minor, Plaintiffs,

v.

E. Harry BOOTHBY, Supt.-Principal, Whitman-Hanson Regional High School, David D. Campbell, Joseph T. Downey, Peter Dersarkisian, George Archer, Donald W. Young, John C. Webster, III, Defendants.

Civ. A. No. 70–1146–G.

United States District Court,
D. Massachusetts.

Oct. 22, 1970.

Edward P. Kirby, Whitman, Mass., for plaintiffs.

Harry Terzian, Whitman, Mass., for defendants.

## OPINION

GARRITY, District Judge.

This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983. The plaintiffs, Patrick M. Hasson, Joseph M. Hickey, Jr. and Robert F. Wheaton, Jr., are junior students at Whitman-Hanson Regional High School (hereinafter the School) in Whitman, Massachusetts. The defendants are Dr. E. Harry Boothby, Superintendent-Principal of the School, and certain named members of the Whitman-Hanson Regional School Committee (hereinafter the School Committee). The court has jurisdiction over this action, based upon the violation of rights secured by and arising under the Constitution of the United States, by virtue of 28 U.S.C. § 1343(3).[1] After hearing the testimony of several witnesses and receiving exhibits and upon consideration of briefs filed before and after the hearing, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. On Friday, April 17, 1970, the first night of a school vacation, the plaintiffs and two other students drank some beer off school premises. The five students then proceeded to the school at around 9:00 P.M., where a dance sponsored by the school was in progress. Upon entering the gymnasium, where the dance was being held, Hasson, Hickey and another student (not a party to this suit) met Ralph Goslin, a teacher and coach of the track team. Apparently Mr. Goslin detected the odor of beer; and both Hasson and Hickey admitted to him that they had consumed some beer. Goslin did not exclude the plaintiffs from

---

1. The court has had some doubt as to its jurisdiction under 28 U.S.C. § 1343(3). See Richards v. Thurston, D.Mass.1969, 304 F.Supp. 449, 455–457, aff'd 1 Cir., 1970, 424 F.2d 1281. However, having heard the case on its merits, the court has resolved the doubt in favor of plaintiffs.

the dance. There was no disturbance of any kind involving any of the plaintiffs or their companions at the dance. The plaintiffs were not drunk.

2. On Saturday, April 18, 1970, plaintiff Hasson reported to Goslin, his coach, for track practice. The coach told him he was off the team for the rest of the season. Plaintiff Hickey reported for varsity baseball games during the vacation week. The baseball coach informed him that he would not be allowed to play in two games scheduled for vacation week. Later, plaintiff Wheaton reported to John J. Hrinko, Dr. Boothby's administrative assistant, that he too had drunk some beer with the others. Wheaton was later informed by the junior varsity baseball coach that he would be excluded from participation for the rest of the season.

3. Upon learning of this incident from the school's athletic director Robert S. Teahan, defendant Boothby directed Hrinko to place all three plaintiffs on probation.[2] During the week of April 27, 1970, Hrinko met individually with each of the plaintiffs (and with the two other students involved) and placed each of them on probation. He sent a letter dated April 29, 1970 to the parents of each plaintiff advising them of this action and the duration of the penalty, one year subject to review. In his letter of April 29, 1970 and in his conversations with the plaintiffs and their parents, Hrinko

claimed that a violation of Mass.G.L. c. 272, § 40A, which forbids, among other things, the possession of alcoholic beverages on school property, was the basis for the punishment meted out by the administration.[3]

4. Following this action, the parents of the plaintiffs met with the school committee twice, on May 13, 1970 and on August 26, 1970. After these meetings, during which the incident and penalties were discussed, the defendant school committee members refused to terminate probation. However, Boothby was instructed to review the cases at the end of the 1970 school year, and monthly thereafter. Boothby reviewed the status of the plaintiffs at the end of the school year and wrote to their parents on July 31, 1970 that the probation would be continued and the cases reviewed at the end of the first marking period. At the hearing, Dr. Boothby testified that plaintiffs' conduct and achievement has been acceptable up to the present time and, if their conduct and achievement continued to be acceptable until the middle of November (the end of the first marking period), their probationary status would be terminated at that time.

5. In April 1970 the Student Handbook contained certain specific prohibitions and associated penalties.[4] Among the major offenses were "use of profane language towards a teacher", "vandalism" and "smoking". However, involvement with alcohol was not embraced

2. In the "Student Handbook, Whitman-Hanson Regional High School" for the school year 1969–70, probation is defined as follows:
"A student on probation is forbidden from: (a) Driving a car to school and parking on the school grounds. (b) Having his car driven to school and parked on the school grounds. (c) Attending dances, plays, musicals, athletic events or any other activities sponsored by the school. (d) Being on the school grounds after school for any reason except authorized makeup work or detention * * *."

3. This statute was inapplicable, since having beer on one's breath or in one's stomach is not "possession" within the meaning

of § 40A. However, the court does not hold school administrators to the strict standards of public prosecutors in framing charges prior to disciplinary action. Consequently, the court has treated this case as if Hrinko had relied on the school administration's inherent authority, as set forth in the general language in the Student Handbook cited in footnote 4.

4. It also contained the following language: "Conduct on the part of any student, either during school hours or at any time outside of school, that brings discredit upon the good name of this school, its faculty and student body, will be considered grounds for disciplinary action as the School Committee may wish to take."

within the specific prohibitions of the handbook, nor was drinking mentioned anywhere else in the handbook.

6. With respect to students' involvement with alcohol, two separate customs had been established at the school. When a case of student drinking was brought to defendant Boothby's attention, he invariably placed the offending student on probation for one year, subject to review. Because of the delicacy of the subject and the possible embarrassment to the offending students, however, the fact of such punishments were never published generally; and Dr. Boothby's policy as to the penalty was known to himself, Mr. Hrinko and very few others. For example, the athletic department did not know about it. There was no outstanding request that coaches report students involved with alcohol to the administration; and there was no reason for the coaches to believe that minor offenses involving alcohol should be brought to the attention of the administration.

7. Moreover, the custom had arisen under the auspices of athletic director Teahan that each coach would discipline student-athletes whose involvement with alcohol came to his attention. Such penalty never exceeded total exclusion from a team for one athletic season. The student-athletes who are plaintiffs in this case knew of this latter custom. They understood that involvement with alcohol on or off school premises was wrong and would be punished.[5] However, they believed that such punishment as was meted out would emanate from the athletic department and would not exceed total exclusion from one sport for one season.

8. One or more of the plaintiffs is a talented athlete with a chance for college participation in sports and conceivably an athletic scholarship. Were it not for their punishment of probation, all three plaintiffs would be participating in the high school athletic program, including varsity football. Especially in a team sport like football, the junior year of participation is vital for development of an individual athlete's potential.

### Conclusions of Law

The plaintiffs do not claim that the conduct for which they were punished, being on school premises with beer on their breaths, is constitutionally protected. Thus, the case at bar differs from Richards v. Thurston, *supra,* where the plaintiff claimed, among other things, that he was entitled to wear his hair in the style of the English singers The Beatles by virtue of the Due Process Clause of the Fourteenth Amendment, and the Court of Appeals so held, stating, " * * * the Due Process Clause of the Fourteenth Amendment establishes a sphere of personal liberty for every individual, subject to reasonable intrusions by the state in furtherance of legitimate state interests." 424 F.2d at 1284.

This is not a case where the procedural fairness of the hearing itself is attacked. The plaintiffs admit that the hearings afforded them by the School Committee on May 13 and August 26 were not constitutionally defective. Rather the basic contention of the plaintiffs is that lack of a published rule concerning the use of alcohol rendered punishment as severe as one year's probation violative of the due process clause.

The desirability of written rules regulating serious disciplinary offenses and penalties in an academic setting is generally recognized today by both academic and legal commentators. Dr. Logan Wilson, president of the American Council on Education, has written:

"An Ivy League president noted some years ago that the fewer rules and regulations a college or a university has for its students, the better. This observation may have been valid for most places then, and for some

---

5. As part of a course in health, the following pamphlets were included in assigned reading: "How Teens Set the Stage for Alcoholism," "Thinking About Drinking" and "Alcohol: Fun or Folly."

places now, but I suspect that many of our institutions must face up to the need for more formalization than they once required. This implies a codification of roles with more specification of behavior norms and set procedures for their enforcement." Wilson, Campus Freedom and Order, 45 Denver L.J. 502, 507 (1968).

Professor Van Alstyne, a recognized legal authority in the field of student rights, has written that the essential elements of fair procedure include the following:

"(1) Serious disciplinary action may not be taken in the absence of published rules which:

(a) are not 'so vague that men of common intelligence must necessarily guess at its meaning and·differ as to its application' and

(b) do not depend upon the unqualified discretion of a particular administrator for their application." Van Alstyne, The Student as University Resident, 45 Denver L.J. 582, 593 (1968).

This growing recognition of the desirability and possible constitutional necessity of prior promulgated rules for the imposition of major penalties by a school administration has been reflected in several recent cases, e. g., Soglin v. Kauffman, W.D.Wis., 1968, 295 F.Supp. 978, aff'd 7 Cir., 1969, 418 F.2d 163, where the University of Wisconsin relied on a broad misconduct rule to suspend and expel certain students charged with obstructing a Dow Chemical recruitment effort and the court held,

"Pursuant to appropriate rule or regulation, the University has the power to maintain order by suspension or expulsion of disruptive students. Requiring that such sanctions be administered in accord with preexisting rules does not place an unwarranted burden upon university administrations. We do not require university codes of conduct to satisfy the same rigorous standards as criminal statutes. We only hold that expulsion and prolonged suspension may not be imposed on students by a university simply on the basis of allegations of 'misconduct' without reference to any preexisting rule which supplies an adequate guide. The possibility of the sweeping application of the standard of 'misconduct' to protected activities does not comport with the guarantees of the First and Fourteenth Amendments. The desired end must be more narrowly achieved." 418 F.2d at 168. See also Hammond v. South Carolina State College, D.S.C., 1967, 272 F.Supp. 947.

However, the opposite position, i. e., that students may be severely punished by a school administration under its inherent authority without a prior published rule specifically prohibiting the conduct in question, still retains great vitality. See, e. ̂ g., Esteban v. Central Missouri State College, W.D.Mo., 1968, 290 F.Supp. 622, aff'd 8 Cir. 1969, 415 F.2d 1077; Jones v. State Bd. of Ed., M.D.Tenn., 1968, 279 F.Supp. 190, aff'd 6 Cir. 1969, 407 F.2d 834, cert. granted 1969, 396 U.S. 817, 90 S.Ct. 145, 24 L.Ed. 2d 69, but dismissed 1970, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27; Barker v. Hardway, S.D.W.Va., 1968, 283 F.Supp. 228, aff'd 4 Cir. 1968, 399 F.2d 638, cert. den. 1969, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217; Norton v. Discipline Committee of East Tennessee State University, 6 Cir. 1969, 419 F.2d 195, cert. denied 1970, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562. And the Court of Appeals for the First Circuit has indicated in dictum that it is generally inclined to favor this view. Richards v. Thurston, *supra*, 424 F.2d at 1282.

In our opinion neither of the competing doctrines is alone sufficient to solve all the problems raised by the imposition of punishment on a student without a prior promulgated rule. We accept the proposition that a school administration, for example the school committee under Mass. G.L. c. 71, § 37, may punish a student offender without a prior rule specifically forbidding the offending conduct; however, surely such authority

cannot be limitless. Moreover, this court believes that the imposition of a severe penalty without a specific promulgated rule might be constitutionally deficient under certain circumstances. What those circumstances are can only be left to the development of the case law in the area. However, at this time the court deems relevant the following factors: (1) prior knowledge of the offending student of the wrongfulness of his conduct and clarity of the public policy involved, (2) potential for a chilling effect on First Amendment rights inherent in the situation, (3) severity of the penalty imposed. Having analyzed the facts of this case in terms of these factors, the court holds that the plaintiffs' rights under the due process clause were not violated by the imposition of a one-year probation, subject to review, for the offense of being on school premises with beer on their breaths, even though no prior published rule forbade such conduct.

First, plaintiffs were aware that involvement with alcohol on or off school premises was wrong and would be punished by school authorities. Each of the plaintiffs was a member of several athletic teams and knew that drinking was forbidden and would be penalized by the athletic department of the school. The notice or warning function of a prior rule was therefore served by the express custom of the athletic department.[6] In addition, plaintiffs are presumed to know the strong public policy against alcohol use by minors as expressed in the pamphlets used in the health course and in the Massachusetts General Laws.[7]

Second, this is not a case where punishment under an overbroad regulation would have the effect of jeopardizing First Amendment rights. Unlike Soglin v. Kauffman, *supra*, where the possible application of the standard of "misconduct" to constitutionally protected activities was considered significant, the application of the standard "conduct * * * that brings discredit upon the good name of the school" to the facts of this case will not unduly "chill" First Amendment rights. There is simply no relationship between the conduct punished here, being present on school premises with beer on one's breath, and First Amendment freedoms deemed so important to the educational process by the Supreme Court in Tinker v. Des Moines Independent Community School Dist., 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 2d 731.

Third, the nature of the penalty imposed is not so severe as to entitle the plaintiffs to full due process protections.[8] The requirements of due process are flexible, and different situations will require different degrees of procedural protection. In Soglin v. Kauffman, *supra*, the district court left open the question whether the doctrines of vagueness and overbreadth would be applied to proceedings "in which the range of possible sanctions is mild, such as the denial of social privileges or a minor

---

6. The only notice which the plaintiffs lacked was that the punishment could be handed down by defendant Boothby and could exceed exclusion from a team for one athletic season.

7. Mass.G.L. c. 71, § 1, directs high schools to instruct students on the effects of alcohol as part of the physiology program. G.L. c. 71, § 30, requires the teaching of sobriety and temperance in the schools. G.L. c. 138, the Alcoholic Beverage Control Law, defines fines and penalties for selling alcohol to a minor (§§ 34 and 34B), for possession of alcohol, and for transportation of alcohol by a minor (§ 34C). It also contains provisions for locations of establishments selling liquor, i. e., not within a prescribed number of feet from schools or churches (§ 16C). G.L. c. 272, § 40A, forbids the giving, selling, delivering or possession of alcoholic beverages on school property.

8. The court relies upon Dr. Boothby's testimony that the penalty of one year's probation means one year subject to frequent review and that in cases involving student drinking the probation has been invariably lifted well before the expiration of the full term. Indeed, were the plaintiffs required to serve the full "sentence" imposed on them for an offense as minor as theirs appears to have been, despite good behavior thereafter, such a penalty might approach the order of arbitrary and capricious in a constitutional sense.

loss of academic credits or perhaps expulsion from a specific course or perhaps a brief suspension." 295 F. Supp. at 991.

The court subscribes to the suggestion of one commentator that a distinction between major offenses to which severe penalties may attach and minor offenses, calling only for mild sanctions, is permissible and that major offenses are those with punishments of expulsion or suspension for any significant time. Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1071 (1969).[9] While there was testimony to the effect that extracurricular activities in general, and athletics in particular, can be an important if not integral part of the educational process, nevertheless the court believes that there is a difference between probation as defined above and suspension from school and that this difference has constitutional significance in the circumstances of this case.

Therefore it is ordered that judgment be entered dismissing the complaint.

---

9. In addition, Van Alstyne has written: "A clear distinction will probably continue to be made, however, respecting campus offenses carrying such relatively insubstantial penalties (e. g., social probation, minor fines, loss of auto privileges) that formal due process is not demanded and may well be dispensed with in the interest of administrative convenience." Van Alstyne, The Student as University Resident, 45 Denver L.J. 582, 597.