**Sabrina Dale PRESS, by next friend, Jesse D. Press, Plaintiff,**

v.

**PASADENA INDEPENDENT SCHOOL DISTRICT, the Board of Trustees of Pasadena Independent School District, the Superintendent of Pasadena Independent School District, and Bryant McDonald, Principal of Jackson Intermediate School, Defendants.**

**Civ. A. No. 71-H-187.**

United States District Court,
S. D. Texas,
Houston Division.

March 4, 1971.

Frederick S. Grossberg and John C. Connolly, Houston, Tex., for plaintiff.

Stanley D. Baskin, Baskin, Fakes & Stanton, Pasadena, Tex., for defendants.

## MEMORANDUM AND ORDER

NOEL, District Judge.

### I. *Preface*

This controversy concerns secondary school discipline. Plaintiff, an eighth grade student, by her father as next friend, sues a school district, its board of trustees, and various school officials. Plaintiff was suspended from the Jackson Intermediate School for the remainder of the spring term as disciplinary action for her disobedience to certain school rules, to wit: the wearing of a pantsuit in violation of the dress code and participation in a demonstration in violation of the disruption policy. It is asserted that this suspension was constitutionally defective. Framing the claim as a class action, plaintiff seeks injunctive and declaratory relief on behalf of herself and of students similarly situated. Rule 23, Fed.R.Civ.P.; 28 U.S.C. § 2201. In view of the Court's decision, it will be unnecessary to discuss or decide whether the class action is properly maintainable. The Court has jurisdiction over the named parties, and the procedural due process aspects of the subject matter. 28 U.S.C. § 1343(3); 42 U.S.C. § 1983.

### I.

The threshold issue presented by this suit is whether such jurisdiction ·as exists should be exercised. As a general proposition a federal court may not decline to entertain an action when its jurisdiction is properly invoked and a claim is stated. Willcox v. Consolidated Gas Company, 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). The exigencies of federalism, however, have caused federal courts to depart from this rule in certain "narrowly limited 'special circumstances'". Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).[1]

1. Although abstention is a creation of judges, its codification has been proposed by the American Law Institute. The proposal reflected an eight year effort to make a more "principled allocation" in response to Mr. Chief Justice Warren's

The first of these occasions for abstention arises when a federal court is invited to hear a case involving a constitutional question which might be avoided, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), or materially altered, Harrison v. National Association for the Advancement of Colored People, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), by prior disposition of questions of state law in state courts. The second is in diversity suits, where abstention has been countenanced when unclear or unusually difficult questions of state law are presented. United Services Life Insurance Co. v. Delaney, 328 F.2d 483 (5th Cir. 1964) (en banc), certiorari denied Paul Revere Life Ins. Co. v. First Nat. Bank in Dallas, 377 U.S. 935, 84 S.Ct. 1335, 12 L.Ed.2d 298 (1964). In the third situation, abstention is required if a federal court is invited to intrude upon an area of paramount state interest in which a developed structure of state administration is operative. Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Public Service Commission v. Southern Railway, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). The presence of all of the foregoing is not necessary in order for it to be appropriate or requisite for a federal court to abstain. Each stands alone as a criterion for abstention. It is the third category which precisely embraces the instant case, as the essentially local nature of disciplinary problems in secondary public education counsels restraint on the part of a lower federal court which is urged to intervene for the purpose of rewriting secondary school rules of discipline.

*Burford* involved an attack upon the validity of an order of the Texas Railroad Commission granting a drilling permit for wells in the East Texas field. The order had been issued pursuant to the Commission's policy of regulating petroleum production by spacing wells and prorating production among individual fields and wells. The State had created a system for orderly judicial review of the Commission's rulings by appeal to a state district court in Travis County and subsequent review by a Court of Civil Appeals and the Texas Supreme Court. In view of the State's high interest in the regulation of its resources and the provision of a complex scheme to effect that regulation by judicially reviewable administrative action, the Supreme Court held that federal courts must decline the invitation to interfere:

The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal question is fully preserved * * *. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

319 U.S. at 332–334, 63 S.Ct. at 1107.

admonition at the Annual Meeting of the Institute in 1959: "It is essential that we achieve a proper jurisdictional balance between the federal and state court systems, assigning to each system those cases most appropriate in the light of the basic principles of federalism." The proposed enactment is summarized at Field, A Summary of American Law Institute Proposals, 46 F.R.D. 141 (1969). The present Chief Justice would appear to be in sympathy with a more principled allocation:

"As to the future I can do no more than emphasize that the federal court system is for a limited purpose and lawyers, the Congress and the public must examine carefully each demand they make on that system. * * * We should look more to state courts familiar with local conditions and local problems." Address by Mr. Chief Justice Warren E. Burger on the State of the Federal Judiciary before the American Bar Association, August 10, 1970.

The principle of the *Burford* case was applied again in Alabama Public Service Commission v. Southern Railway, supra. There, a state regulatory agency had denied the plaintiff railroad leave to discontinue local passenger service which was being operated at a loss. In holding that the District Court erred by enjoining enforcement of this order, the Supreme Court noted that intrastate passenger service was an "essentially local problem" for which the State had created a regulatory commission whose orders were reviewable in the state courts:

> As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, *intervention of a federal court is not necessary for the protection of federal rights* \* \* \*. Considering that "(f)ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies", [Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971,] *the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court in this case.* Whatever rights appellee may have are to be. pursued through the state courts. (emphasis added)

341 U.S. at 349–350, 71 S.Ct. at 768.

The heart of this matter lies in "comity," and the Supreme Court of the United States, within the last fortnight, has reaffirmed its admonition that District Courts must exercise their equity powers with high regard to the principles which that word embraces. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In holding that a three-judge federal District Court erred by enjoining a state criminal prosecution, Mr. Justice Black in writing for the Court defined "comity" in traditional terms which deserve emphasis here:

> \* \* \* the notion of "comity", that is a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.

401 U.S. at 44, 91 S.Ct. at 750.

Grounded as it is in considerations of comity, *Burford-Alabama* abstention is appropriate in cases which share one or more of three characteristic factors, all of which are present in the case at bar:

1. *A legitimate state interest, in addition to private rights, must be at stake in the controversy.* It cannot be gainsaid that public instruction is an area of legitimate and even paramount state interest. It is "perhaps the most important function of state and local governments." Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954). As this Court noted in Schwartz v. Galveston

Independent School District, 309 F.Supp. 1034, 1045 (1970):

> * * * (T)he education of Texas children is not an incidental activity of the State of Texas. It is an activity to which the State has devoted the income from millions of acres of public lands, as well as large sums from its general revenues. More than financial, the State's concern has extended to an eager acceptance of its obligation and responsibility to exercise administrative supervision over the local officials directly responsible for educating the children in each of its more than 1,200 school districts.

2. *The controversy must touch upon matters which are essentially local in nature and entail policy considerations necessarily affected by local factors.* Controversies involving the governance of the public schools are apt to be pervaded by considerations of a local nature. This is an inevitability due to the decentralized nature of school administration, characterized by myriad district school boards which often enjoy localized taxing power and which are composed of local citizens answerable for their actions to local electorates. These factors compel the conclusion that operational administration of secondary schools has properly devolved upon the States and their political subdivisions, and is a subject inherently ill-suited to the sort of national uniformity which would necessarily result from frequent constitutional adjudication in the lower federal courts. We have this upon the high authority of Mr. Justice Black, who, as presiding Justice of this Circuit, was recently urged to grant a motion to vacate a stay of injunction in what has become too well-known in the federal courts as a "hair case". Karr v. Schmidt, 401 U.S. 1201, 91 S.Ct. 592, 27 L.Ed.2d 797 (1971), motion denied by the United States Supreme Court, 401 U.S. 930, 91 S.Ct. 914, 28 L.Ed.2d 211, 1971. The relief sought would have had the effect of prohibiting school authorities of the City of El Paso from enforcing a rule relating to the hair styles of public school students. In denying the application, Mr. Justice Black eloquently emphasized the local nature of secondary school discipline:

> * * * (O)ur Constitution has sought to distribute the powers of government in this Nation between the United States and the States. Surely the federal judiciary can perform no greater service to the Nation than to leave the States unhampered in the performance of their purely local affairs. Surely few policies can be thought of in which States are more capable of deciding than the length of the hair of school boys. There can, of course, be honest differences of opinion as to whether any government, state or federal, should as a matter of public policy regulate the length of haircuts, but it would be difficult to prove by reason, logic, or common sense that the federal judiciary is more competent to deal with hair length than are the local school authorities and state legislatures of all our 50 States. Perhaps if the courts will leave the States free to perform their own constitutional duties they will at least be able successfully to regulate the length of hair their public school students can wear. (Reproduced in full as Appendix A.)

3. The third, and perhaps most important, requisite of abstention is *that the matter in controversy must be the subject of a formally structured and relatively comprehensive scheme of state administration and the legality of administrative action must be reviewable in the state judicial system, with ultimate review of federal constitutional questions in the United States Supreme Court.*

Secondary school administrators are responsible for the education of children ranging in classification from kindergarten through high school, between the ages of five and eighteen. There is no other age range in the life span of persons which embraces such a diversity of experience, knowledge, perception, or judgment. It embraces those ages at

which children are most compliant, as well as most rebellious. The latter characteristic of secondary school children creates problems which the administrators must resolve daily in order that the educational process not be disrupted. It is a well established fact that in a school where there is poor discipline, there is a substantially reduced opportunity for learning. Additionally, school administrators must deal also with parents of divergent ethnic, cultural and economic backgrounds, which compounds the daily problems of administration. Thus, the governance of secondary schools is a contentious process fraught with emotional involvement, which engenders sharp differences of opinion, disputes, and occasionally, litigation.

The countless frictions which are necessarily generated by routine operation of a school system may best be resolved within the institutional framework of that system. Texas has created a comprehensive structure for administration of its secondary schools and has provided a mechanism for the resolution of controversies arising therefrom. It has established a central agency as "the policy-forming and planning body for the public school system of the state." Tex. Educ.Code Ann. § 11.24(a), V.T.C.A. It has provided for the enactment, dissemination, and enforcement of state-wide rules and regulations. Id. §§ 11.13, 11.24, 11.25(a), (b). Perhaps most significantly, it has provided judicial supervision over its educational system, and its courts have been demonstrably effective in keeping administrative action within the law. A reasonable test of this effectiveness is to ask whether state courts would hear student claims with as compassionate a concern as a federal court would, and suffer from no short-coming not shared by federal courts which might prevent them from reaching a just result.

Instances of local school board action have been frequently litigated in state court.[2] Recent cases have been brought by students suspended by local boards because of marriage. Carrollton-Farmers Branch Ind. School District v. Knight, 418 S.W.2d 535 (Tex.Civ.App.— Texarkana 1967, writ ref'd n. r. e.); Anderson v. Canyon Ind. School District, 412 S.W.2d 387 (Tex.Civ.App.—Amarillo, 1967, no writ); Alvin Ind. School District v. Cooper, 404 S.W.2d 76 (Tex. Civ.App.—Houston, 1966, no writ). In each of these three cases the district court took jurisdiction in spite of failure to exhaust administrative remedies on the ground that no questions of fact were presented, and granted immediate relief pendente lite. In each case the decision below was affirmed within months (in one case, within weeks). No constitutional issue was reached, the courts holding that state law did not authorize the action taken.

2. Cases brought by students include Allen v. Chacon, 449 S.W.2d 289 (Tex.Civ. App.—Dallas 1969, no writ); Passel v. Fort Worth Ind. School Dist., 440 S.W.2d 61 (Tex.1969), rev'g 429 S.W.2d 917 (Tex.Civ.App.—Fort Worth 1968); Bishop v. Houston Ind. School Dist., 119 Tex. 403, 29 S.W.2d 312 (1930); Carrollton-Farmers Branch Ind. School Dist. v. Knight, 418 S.W.2d 535 (Tex.Civ.App.— Texarkana 1967, writ ref'd n. r. e.); Anderson v. Canyon Ind. School Dist., 412 S.W.2d 387 (Tex.Civ.App.—Amarillo 1967, no writ); Alvin Ind. School Dist. v. Cooper, 404 S.W.2d 76 (Tex.Civ.App.— Houston 1966, no writ); Wilson v. Abilene Ind. School Dist., 190 S.W.2d 406 (Tex.Civ.App.—Eastland 1945, writ ref'd w. o. m.); Shinn v. Barrow, 121 S. W.2d 450 (Tex.Civ.App.—Galveston 1938, writ dism'd). Other cases attacking local action include Cook v. Neill, 163 Tex. 49, 352 S.W.2d 258 (1961); Mission Ind. School Dist. v. Diserens, 144 Tex. 107, 188 S.W.2d 568, 161 A.L.R. 877 (1945); Palmer Pub. Co. v. Smith, 130 Tex. 346, 109 S.W.2d 158 (1937); McIntyre v. Hoblinski, 333 S.W.2d 697 (Tex.Civ. App.—Waco 1960, writ ref'd); Bear v. Donna Ind. School Dist., 74 S.W.2d 179 (Tex.Civ.App.—San Antonio 1934, writ ref'd); State ex rel. Marrs v. Abshier, 263 S.W. 263 (Tex.Com.App.1924, judgmt. adopted); Farrar v. Colorado Ind. School Dist., 444 S.W.2d 204 (Tex. Civ.App.—Eastland 1969, writ ref'd n. r. e.); James v. Board of Trustees, 376 S. W.2d 956 (Tex.Civ.App.—San Antonio 1964, no writ); Daniel v. Dallas Ind. School Dist., 351 S.W.2d 356 (Tex.Civ. App.—El Paso, 1961, writ ref'd n. r. e.)

By overturning actions by local school boards without reaching constitutional arguments, the courts evidenced a special concern to restrict arbitrary school action resulting in student suspensions. Federal courts certainly could do no more. In fact, since the authority of school boards depends so greatly on a construction of state statutes drawn in the broadest terms and seldom construed, federal courts should necessarily be more constrained in reviewing local action. To the extent that constitutional questions may be presented in such suits, the state courts are both competent and ready to vindicate constitutional rights, with the ultimate availability of review in the United States Supreme Court.

As the courts of this State have been notably sensitive to grievances of students in the State's educational system, there is simply no justification for federal intrusion. Although Younger v. Harris, supra, and its companion cases decided the same day, condemned injunctive interference with criminal proceedings pending in state courts, and necessarily reflected the traditional reluctance of equity to enjoin criminal prosecutions, the clear theme upon which the cases are pinioned is comity. As the Court emphasized, Congress has since the infancy of this Republic manifested a desire that state courts should go about their business unhindered by federal courts. This national policy was reflected in an Act of 1793 unconditionally providing that " * * * nor shall a writ of injunction be granted to stay proceedings in any court of any state * * * " 1 Stat. 335, c. 22. Its substantially identical modern counterpart, 28 U.S.C. § 2283, forbids a federal court to grant an injunction to stay proceedings in a state court except in certain exceptional circumstances.

It is not suggested that this statute is by its terms applicable to the instant case, because no state court litigation is pending. However, it is the strong policy expressed in the Anti-Injunction Statute which is of considerable moment here, and "(t)he Act of 1793 expresses the desire of Congress to avoid friction between the federal government and the states resulting from the intrusion of federal authority into the orderly functioning of a state's judicial process." Toucey v. New York Life Insurance Company, 314 U.S. 118, 135, 62 S.Ct. 139, 145, 86 L.Ed. 100 (1941).

When a State has provided an adequate, flexible, and effective means for judicial review of administrative action in an area of predominantly state and local subject matter, the premature intervention of a lower federal court cuts off and preempts the state judicial processes just as surely, just as bluntly, and just as abrasively as an injunction; not only has defendants' right to have these peculiarly local matters decided by a state court been "chilled" as expressed in current federal constitutional vernacular, such right has been frozen. In short, it has come to pass that the mere filing in a federal courthouse of this sort of lawsuit by disgruntled schoolchildren or their parents amounts to the issuance of a *de facto* injunction against orderly state processes. When that occurs, whatever the outcome on the merits, the State's system for administrative resolution of such conflicts has been bypassed, and the state courts have, in effect, been stripped of their proper jurisdiction. It is precisely this sort of "cutting off at the pass" which is soundly condemned by the policy of federalism implicit in the Anti-Injunction Act and its judicial counterpart, the abstention doctrine. When a federal District Court finds its process thus exploited, a decent respect for the principle of comity demands abstention.[3]

From an unfavorable decision of the board, plaintiff might have appealed to

---

3. In certain situations, the considerations against premature federal intervention are so compelling that Congress has mandated abstention in the form of a statutory exhaustion requirement. Examples of this are 28 U.S.C. § 2254 (habeas corpus); 28 U.S.C. § 1342 (state rate orders), and 28 U.S.C. § 1341 (state taxes). It is

the State Commissioner of Education and from the Commissioner's decision, to the State Board of Education. Tex.Educ. Code Ann. § 11.13(a), (b). If the determination of the State Board was unsatisfactory, it might have been challenged in a state district court in Travis County. Id. § 11.13(c). Alternatively, where as here plaintiff's dispute with local officials turned only upon issues of law, she was entitled to bring her suit immediately in any State court of competent jurisdiction, and there receive the relief, if any, to which she was entitled. Passel v. Fort Worth Ind. School Dist., 440 S.W.2d 61 (Tex.1969). Finally, plaintiff may in due course take her grievance to the voters of the school district (which according to the complaint her mother has sought to do) and, if a majority share her views on the issue of pantsuits, a like-minded school board may be elected.

However, plaintiff has not sought redress of her grievance by means of administrative appeal of the school board's

determination or judicial review of that ruling in the state courts. Her diligent efforts to change the rule of her current school board by political means, including the collection of a thousand signatures upon a petition, have been to no avail. Apparently as a last resort, by uttering the incantation of a few constitutional phrases, plaintiff seeks to enlist this federal court as an ally in what is essentially a local squabble about matters of taste.

█ From the foregoing it is apparent that the case at bar presents a strikingly appropriate occasion for this Court, in its discretion as a court of equity, to abstain. The questions raised and the relief sought, calling as they do for a sortie by this Court into an area of the utmost state interest and responsibility, clearly present all of the factors which have traditionally counselled restraint in the interest of avoiding "needless federal conflict with the state policy * * *" Burford, 319 U.S. at 327, 63 S.Ct. at 1104.[4] Accordingly, this case should be dismissed.[5]

---

significant that all three of these provisions had judicial predecessors. The enactment of 28 U.S.C. § 2254 was merely codification of Ex Parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944) and earlier cases such as Urquhart v. Brown, 205 U.S. 179, 27 S.Ct. 459, 51 L. Ed. 760 (1907) and Ex Parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886). See Longsdorf, The Federal Habeas Corpus Acts Original and Amended, 13 F.R.D. 407, 421 (1953); Sokol, Federal Habeas Corpus 159–162 (2d ed. 1969). Similarly, 28 U.S.C. § 1342 was foreshadowed by Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908). Finally, 28 U.S.C. § 1341 was but a logical extension of the principle announced five years before in Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1932): "The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief be denied in every case where the asserted federal right may be preserved without it."

4. The Court of Appeals for this Circuit has recently suggested that abstention may never be appropriate in a Section 1983

case where none of the factors discussed above are present. Cf. Hall v. Garson, 430 F.2d 430 (5th Cir. 1970), which involved a challenge to a state landlord's lien statute, and Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970), a suit by a city employee involving allegations of racial discrimination. Neither case presented a subject matter of particular federal-state sensitivity, nor touched upon an essentially local controversy, nor called for intrusion into an elaborate state administrative structure. By contrast, it is emphasized that all of these considerations are present in the instant case—a secondary public school discipline case. It should also be noted that the case at bar does not present questions of strong national interest, immediacy, and importance—such as denial of the right to vote—which might counsel against abstention in other contexts. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Edwards v. Sammons, 437 F.2d 1240 (5th Cir., 1971)

5. "In Burford-type abstention, where the federal court defers to avoid interference with state activities, dismissal of the action, rather than retention of jurisdiction pending a state determination, is normally appropriate." C. Wright, Federal Courts 200 (2d ed. 1970).

## II.

Alternatively, if abstention is neither required nor appropriate in this case, (i) plaintiff is not entitled to prevail on the merits of her claim of deprivation of procedural due process, and (ii) her other claimed violations of her constitutional rights are either not well plead, or are self-dispositive from other allegations and admissions in her complaint.

The constitutional theories stated in the complaint are several, and the full factual development of each without prior regard to its sufficiency in law, would have invited a rather lengthy trial. In the interest of the orderly administration of justice, the Court of Appeals for the Fifth Circuit has recently warned District Courts against allowing full development of the merits in this type of case as a matter of course. As stated in Ferguson v. Thomas, 430 F.2d 852, 853, 858 (5th Cir. 1970):

> To do so routinely in every such case constitutes both an intrusion into the internal affairs of state educational institutions and an unwise burden on judicial administration of the courts. School constituted review bodies are the proper forums for thrashing out such matters. Federal Court hearings in cases of this type should be limited in the first instance to the question of whether federal rights have been violated in the procedures followed by the academic agency in processing the plaintiff's grievance. * * * If no federal right has been violated in the procedures followed, then the Court should next look to the record as developed before the academic agency to determine whether there was substantial evidence before the agency to support the action taken * * *. If the procedures followed were correct and substantial evidence appears to support the Board's action, that ordinarily ends the matter.

Mindful of this admonition, the Court limited the one-day trial of this cause to the issue of whether plaintiff's suspension was effected with the procedural regularity and fairness which the Fourteenth Amendment to the Federal Constitution requires of state agencies.

## FINDINGS OF FACT

A. Plaintiff filed suit on Thursday, February 18, 1971. Although the complaint recited a prayer for a temporary restraining order, this ex parte relief was not urged, as a pretrial conference and evidentiary hearing was immediately set for Monday, February 22, 1971. Defendants filed a motion to dismiss. At hearing, evidence was received on the issue of procedural due process, after which this Court ruled from the bench, denying all relief and preliminarily stating its reasons therefor. The Court now makes its formal findings of fact and conclusions of law, Rule 52, Fed.R. Civ.P., which supersede in all respects its oral ruling.

B. The board of trustees of the Pasadena Independent School District has adopted a discipline code prescribing standards of student conduct in the areas of orderly deportment, drug abuse, disruptions, and personal appearance.

C. The rule relating to disruptions prohibits demonstrative activity which disturbs the normal tranquillity of the school. Such activity is explicitly defined by the rule to include protest demonstrations such as "walkouts".

D. The rule relating to dress provides that girls may not wear "any type trouser garment".

E. At the beginning of the 1970–71 school year, plaintiff was provided with a copy of the rules noted above. At that time, plaintiff and her mother signed a statement certifying that they had read and understood the rules.

F. On November 17, 1970, plaintiff wore a pantsuit to school in clear violation of the dress code. She was suspended for a period of three days by reason of insubordination. No appeal from this action was taken to the school board, and plaintiff maintained proper deportment for the remainder of the fall term.

G. Early in the spring term, on January 20, 1971, plaintiff went to school wearing a pantsuit covered by a long (or "maxi") dress. Before the morning bell admitting the students to the building, plaintiff and other students gathered in preparation for a demonstration which had been prearranged. After the sounding of the morning bell, plaintiff and others conducted a demonstration against the dress code by forming a procession, marching through the school halls, and congregating outside the building near the flagpole. This demonstration occurred during school hours on school property.

H. The assistant principal went out to the flagpole and reminded the students they were accountable for their conduct, that they were in violation of the dress code and disruption policy, and that the rules would be enforced. He asked the children to return to the school building. At first, plaintiff declined and said newspaper reporters and photographers would be there in a few minutes. After a short time, the students did return to the building where they reassembled in the assistant principal's outer office, where Mrs. Press delivered to plaintiff a dress to replace the maxi which had been loaned out.

At some point after her arrival at school but before being dismissed from the office of the assistant principal, plaintiff testified she removed her maxi to lend it to another child who had worn a pantsuit without a maxi. The assistant principal testified plaintiff did not have her maxi on during the demonstration but plaintiff testified that she did. In any event on January 20 plaintiff removed her maxi and wore her pantsuit in clear, open and intentional violation of the dress code.

J. On the afternoon of January 20, plaintiff and several other children were suspended from school for violation of the school disruption policy. Plaintiff's suspension was for the remainder of the term,[6] its severity being attributable to the fact of the second offense. During that afternoon, plaintiff's mother, Mrs. Jesse D. Press, was notified of this action by telephone.

K. Also on January 20, a letter was sent to Mr. and Mrs. Press over the signatures of the school principal and assistant principal. It advised them of their daughter's suspension, and informed that "(s)hould you desire to appeal this suspension, you may call Mr. George Thompson and make an appointment for a conference." Mr. Thompson is the district superintendent of schools.

L. Rather than contacting the superintendent in accordance with the procedure prescribed by the suspension notice, Mrs. Press telephoned a Mr. Morris, member of the board of trustees. After an extended conversation, it was agreed that plaintiff and her parents sould appear before the school board the following evening, January 21, 1971, for the purpose of a hearing.

M. During the school day of January 21, all of the suspended children other than plaintiff were readmitted to school after their parents had initiated the proper appellate procedure and conferred with school officials. The parents of the readmitted children gave assurances that their children would comply with the rules in the future.

N. Plaintiff and her parents appeared at the board meeting on the evening of January 21. A tape recording of that meeting was introduced in evidence and played back at trial. Although the recording is somewhat unclear, plaintiff's mother testified that it was correct insofar as it could be understood. There was no significant dispute as to the essential facts surrounding the incident. Although the extent of plaintiff's leadership role in the demonstra-

---

6. "The board of trustees of any school district may suspend from the privileges of the schools any pupil found guilty of incorrigible conduct, but such suspension shall not extend beyond the current term of the school." Tex.Educ.Code Ann. § 21.301.

tion was debated, the fact of her participation was uncontroverted, as was the fact that she had worn and displayed a pantsuit.

O. Plaintiff's mother testified in this Court that she had been given to understand that she could not produce witnesses before the board, although she also testified that she had a witness in her car during the hearing, ready and available to testify if called. She testified that she asked to present the witness at the board hearing but was denied the opportunity. This was controverted by more credible testimony at trial, the taped record of the hearing, and general inconsistency in the testimony and conduct of Mrs. Press.

The taped record reflects that she stated that she had been told not to bring witnesses, the clear implication being that this occurred in her conversation with Mr. Morris, a trustee whom she called and who arranged the hearing for her. However, the taped record does not reflect that she asked to present a witness at hearing, or even mentioned the presence of the prospective witness sitting out in her car. Additionally, at trial Mrs. Press was very reluctant to reveal the name of her witness for the stated reason that the witness' child was involved in the incident and might be embarrassed. It appears that her purpose in bringing the witness was to show that the witness' child was a leader or instigator of the protest demonstration, not plaintiff.

Upon questioning by the Court at today's hearing, the prospective witness testified that her testimony embraced her complete knowledge of the occurrence on January 20, that her son was a participant in the demonstration, and that her own daughter was suspended from Pasadena High School on the same day for a pantsuit violation. The taped record does not reflect that there was a discussion of plaintiff's involvement, if any, in planning the demonstration. At the hearing, it was uncontroverted and conceded by all that plaintiff knowingly violated the regulation. At the hear-

ing today, the prospective witness did testify, the record having been reopened at the instance of the Court for that purpose.

From all the facts and circumstances offered in evidence, I find that neither plaintiff, her father, nor her mother offered the testimony at the board hearing, and, furthermore, that the presence of the witness could not have affected the outcome because her testimony as to matters within her knowledge would have been cumulative of the uncontroverted facts, conceded by all at the hearing. Therefore, the Court finds that the board did not deny Mrs. Press the right to produce witnesses.

P. After the hearing had been concluded and plaintiff and her parents had departed, the board decided to readmit plaintiff to school upon condition that plaintiff's parents give to the superintendent assurances that plaintiff would henceforth obey the rules.

Q. The following day, the secretary of the board communicated the board's decision to Mrs. Press by telephone.

R. The Presses have subsequently declined to contact the superintendent and have failed to give him the assurances which the board deems a safeguard necessary to plaintiff's reinstatement. Accordingly, the suspension was in effect on the date of trial.

## CONCLUSIONS OF LAW

A. As the plaintiff's parents have not presented their grievance to the superintendent of schools, in compliance with the procedure directed by the board of trustees, the state action is not final in the institutional sense and this suit is not ripe for adjudication. As the Court of Appeals pointed out in Stevenson v. Board of Education of Wheeler County, 426 F.2d 1154, 1157 (5th Cir. 1970) certiorari denied 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970):

We mean by finality that the expulsion is not ripe for adjudication absent the denial of relief to the student by the school board or the designee of

the school board, for such purposes * * *

* * * federal courts are [not] to intervene in school personnel and management problems without such prior reference to local institutional authority as may be necessary to assure that the action complained of is final within the institution in the sense that it is ripe for adjudication.

In the instant case, the "action complained of" is the suspension. It is abundantly clear from the record that the board is prepared to vacate the suspension as soon as its designated official, the superintendent, receives assurances of future good conduct. The board has so instructed its superintendent and the matter now merely awaits an initiative by plaintiff, which has not come. As institutional remedies are not only unexhausted but have been deliberately bypassed, it would be inappropriate for this Court to exercise jurisdiction.

■■ B. As plaintiff seeks injunctive relief, this Court sits as a court of equity, and the equitable doctrine of clean hands is applicable. As noted above, plaintiff remains out of school only because plaintiff's father and mother, one of whom is a party to this suit, decline to give assurances of plaintiff's future good conduct to the superintendent. He is the officer charged with executing the board's policy, and it is entirely proper for the board to require that the assurances be given to him. This is merely to insist that the proper institutional chain of authority be observed. It appeared at trial that plaintiffs had no substantive objection to giving such assurances, as they had done so before at the beginning of the school year, but simply declined to meet with the superintendent by reason of personal pique. The occasional necessity for a citizen to deal with a public official whom he may find personally distasteful is one of "the incidental evils which attend upon republican govern-

ment," [7] and does not justify judicial short-circuiting of the administrative process. Plaintiff's present predicament would thus appear to be entirely self-inflicted in that her continued suspension is due to the deliberate inaction of her parents, one of whom appears here as next friend. Under such circumstances, it cannot be said that plaintiff turns to the Chancellor with clean hands.

■ C. Plaintiff's assertion that the procedure employed by the board in effecting her suspension did not meet the requirements of due process is without merit. In assessing the procedural regularity of a school board determination, the point of departure is necessarily Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), certiorari denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). Dixon is here important not for its announcement as to the procedure necessary in the expulsion of a college student for off-campus activity, but rather for its recognition that "the nature of the hearing should vary depending upon the circumstances of the particular case * * *" 294 F.2d at 158. It has been repeatedly recognized that the broad standards of Dixon are not "wooden absolutes" and "(t)he sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Ferguson v. Thomas, supra, 430 F.2d at 856. Cf. Wright v. Texas Southern University, 392 F.2d 728 (5th Cir. 1968); Due v. Florida A & M University, 233 F.Supp. 396 (N.D.Fla.1963).

In the instant case, the peculiar circumstance most relevant to procedure was that plaintiff never denied that she had committed the rule violations for which she has been punished. Nor was there any dispute about inadequate notice of the nature of the charge. Nor was there any question of insubstantial evidence to support the charge. The

7. Remarks of Representative Hoar of Massachusetts, Cong.Globe, 42nd Cong., 1st Sess. 334 (Mar. 29, 1871), reprinted in The Reconstruction Amendment Debates 501 (Va.Comm's on Const.Govt. 1967). See Schwartz v. Galveston Independent School District, 309 F.Supp. 1034, 1043 (S.D.Tex.1970).

session of the board was therefore relieved of a fact-finding role as well as the procedural niceties attendant upon the fact-finding process. Plaintiff and her parents were given a hearing and were allowed to present their side of the story, which consisted primarily of argument. The tape recording reflects that the hearing was not a model of judicial decorum, a circumstance for which plaintiff's main witness, Mrs. Press, must assume at least as much responsibility as the board. However, there was no attempt to silence or intimidate anyone. To the contrary, unfettered and sometimes intemperate expression of opinion seems to have been the order of the evening. In any event, under the circumstances of this case, the hearing was sufficient and fully preserved the "rudimentary elements of fair play." *Dixon,* supra, 294 F.2d at 159.

D. Plaintiff also contends that her First Amendment rights have been violated. Plaintiff testified that during the walkout demonstration she had on her maxi (long dress) over her pants and that she did not remove her maxi until she returned to the building. The wearing of the pantsuit in and of itself was not intended to convey a thought or an idea, but, assuming arguendo, that the pantsuit was a form of communication, it was not that sort of expression protected by the First Amendment because it necessarily entailed violation of a school rule. As the Court of Appeals observed in Ferrell v. Dallas Independent School District, 392 F.2d 697, 703 (5th Cir. 1968) certiorari denied 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968):

> The interest of the state in maintaining an effective and efficient school system is of paramount importance. That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. This is true even when that which is condemned is the exercise of a constitutionally protected right.

For the same reason, the walkout demonstration which was intended to convey plaintiff's opposition to and disapproval of the school dress code, was not constitutionally protected. The demonstration violated a clear and unequivocal school rule. It occurred upon school property and at a time when plaintiff and the other demonstrators should have been engaged in classwork. Its occurrence interrupted the pedagogical regimen of the day. It is well settled that demonstrative activity such as this in secondary schools, which is disruptive of the educational process or is calculated to undermine the school routine, forfeits the shield of the First Amendment. Cf. Tinker v. Des Moines Ind. Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966).

On the subject of freedom of speech, note should be taken of a rather vague intimation in the complaint that defendants intentionally punished the minor plaintiff as a means of retribution against her mother and with the intent of discouraging the mother's exercise of her freedoms of speech and petition. Plaintiff's mother is not a party to this cause.

Although highly technical forms of pleading no longer prevail in the federal courts, it is still mandatory that there be "a short and plain statement of the claim showing that the pleader is entitled to relief. * * *" Rule 8(a) (2), Fed. R.Civ.P. Although the facts supporting a claim need not be set out in great detail, the averments should be sufficiently particularized to afford the defendant fair notice of the nature of the plaintiff's claim and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As minimal requirements of pleading sufficiency apply to civil rights suits as well as other civil litigation, especially when extraordinary relief is sought against a public body, there is some question whether this portion of the complaint states a claim.

However, it is unnecessary to decide the point. From the evidence presented, it is clear that the board had adequate, objective, and legally sufficient cause to discipline plaintiff for her disobedience. That is as far as the Court need go.

There would be no purpose in inquiring into any alleged political differences between plaintiff's mother and the board, or her political efforts to persuade the board to change the pantsuit rule. Indeed, in the unlikely circumstance that any "chilling" of expression resulted incidentally from the completely lawful exercise of the board's legitimate powers, it is unfortunate but not constitutionally forbidden. Moreover, if plaintiff's mother, who is not a party to this suit, considers her constitutional rights to have been abridged in any way, it is a case for her to bring on her own behalf. Neither plaintiff, nor plaintiff's father as her next friend,[8] has standing to sue on behalf of plaintiff's mother.

 E. With more ingenuity than merit, plaintiff also asserts that her suspension constituted cruel and unusual punishment within the meaning of the Eighth Amendment of the Federal Constitution. As the Supreme Court noted in Powell v. Texas, 392 U.S. 514, 531, 88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254 (1968), "(t)he primary purpose of that clause has always been considered, and properly so, to be directed at the method or kind of punishment imposed for violation of criminal statutes * * *" As plaintiff has not been the subject of any criminal sanction, and has not been abused, tortured, or otherwise brutalized, she is clearly not within the ambit of that Amendment.

F. Finally, the Pasadena Independent School District's discipline code is not invalid on its face. Although it has been held that the constitutional doctrines of void-for-vagueness and overbreadth are applicable to school disciplinary rules and require a correspondingly high degree of specificity, Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (S.D.Tex. 1969); Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969), the more persuasive authority is to the contrary in varying degrees. Cf. Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195 (6th Cir. 1969), certiorari denied 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970); Esteban v. Central Missouri State College, 415 F. 2d 1077 (8th Cir. 1969) certiorari denied 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); French v. Bashful, 303 F. Supp. 1333 (E.D.La.1969), aff'd on other grounds 425 F.2d 182 (5th Cir. 1970); Buttny v. Smiley, 281 F.Supp. 280 (D. Col.1968); Jones v. State Board of Education, 279 F.Supp. 190 (M.D.Tenn. 1968), aff'd 407 F.2d 834 (6th Cir. 1969), certiorari dism'd as improvidently granted 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970); General Order on Review of Student Discipline, 45 F.R.D. 133, 146 (W.D.Mo.1968); Speake v. Grantham, 317 F.Supp. 1253 (S.D. Miss.1970); Report of the American Bar Association Commission on Campus Government and Student Dissent (1970), discussed in Sill v. Pennsylvania State University, 318 F.Supp. 608, 618 (M.D. Pa.1970). Were it necessary to decision, this Court would be inclined to add its voice to the second chorus for the uncomplicated reason that school boards are not legislatures and school rules are not statutes. However, in the instant case, dispute over the wording and abstract validity of Pasadena's policy is

---

8. Although Mr. Press did not testify at trial, his brief remarks at the school board hearing suggest that he has correctly analyzed this controversy as essentially a policy disagreement:

 Mr. Turner: Mr. Press, do you have any comment you would like to make?

 Mr. Press: (No reply)

 Mr. Morris: Do you think that we're unreasonable?

 Mr. Press: Well, I can't say that you're unreasonable. I know that you all have rules that you all think is right for people, naturally.

 Mr. Morris: That's right.

 Mr. Press: I mean if I was sitting in your chair, I might feel the same way, but in her own mind she's right.

somewhat beside the mark. The rules clearly forbade the wearing of "any trouser type garment," as well as the participation in "walkouts." The nature of the proscribed conduct is clear. Plaintiff was familiar with these rules, and deliberately chose to flaunt them. Plaintiff's parents were also familiar with these rules, and knowingly permitted her to flaunt them.

▮ Furthermore, to the extent that the disruptions policy on its face serves to discourage certain forms of expression in the school atmosphere, this limited curtailment is well within the power of the State. As the Supreme Court put it in Younger v. Harris, supra, 401 U.S. at 51, 91 S.Ct. at 754:

> Moreover, the existence of a "chilling effect," even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so.

The crux of the matter is that plaintiff dislikes the rules as they presently stand and urges this Court to rewrite them. In so doing, plaintiff relies on 42 U.S.C. § 1983, a statute which is no more than a cross-reference to the Federal Constitution. In hearing a Section 1983 case, a Court must find its decisional standards in that same basic charter. But, where in the Fourteenth Amendment are the standards against which to measure the secondary school rules here considered?

There was a time when federal courts undertook to strike down State economic regulatory legislation, not because it violated some clear command of the Constitution, but because it was deemed by some judges to be unwise. Opposing this pernicious tendency, Mr. Justice Holmes observed that "(t)he Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." Lochner v. New York, 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). Today, when the Fourteenth Amendment is being similarly exploited, it might be remarked with aptness that this Amendment does not enact the educational theories of Mr. John Dewey, nor those of any given federal judge.

Is the Court invited to return to the discredited concepts of substantive due process and brazenly substitute its educational policy preference or its taste in dress for the judgment of a legislature or school board which is directly answerable to the electorate? Similarly, does equal protection of the laws require that the children of Point Barrow, Alaska, be permitted to wear shorts to school in December if the children of Tucson, Arizona, may do so, or that a Houston schoolgirl must be allowed to wear a pantsuit to school in January if her counterpart in Portland, Maine, may do so? To pose such questions is to answer them—they are simply not the stuff of constitutional law.[9]

---

9. The judicial review of school rules by federal courts is producing a jurisprudence which is notable for its volume if not its consistency. Such questions have arisen on several occasions in this judicial district. For example, in Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (S.D.Tex.1969), a regulation of the defendant district was voided on the ground of overbreadth. In another suit, the same regulation was approved. Graham v. Houston Independent School District, 69–H–1019 (S.D. Tex.1970). See also Pritchard v. Spring Branch Independent School District, 308 F.Supp. 570 (S.D.Tex.1970).

It should be emphasized that the instant case involved an intermediate secondary school, and, specifically, an eighth-grade plaintiff. It is unnecessary to decide, whether the factors which counsel restraint in a secondary school case would also apply to a case involving a college or junior college. Cf. Calbillo v. San Jacinto Junior College, 305 F.Supp. 857 (S.D. Tex.1969).

Ours is a large and heterogeneous union of fifty States, each of which administers a system of public education in a more or less democratically responsive manner. Climatic conditions, ethnic compositions, cultural mores, and attitudes about proper deportment of school children vary by region and locale. Within an area demarked by well-defined federally protected rights—such as the right to be free from racial discrimination—there is a broad zone of flexibility in which this healthy diversity may reflect itself through the governance of the secondary schools. The rules here challenged fall well within that zone.

■■■■ G. To turn in the end to first principles, the presence of a justiciable case or controversy is a sine qua non of the federal judicial power. U.S. Const. art. III, § 2. This requirement is not avoided by the procedural device of the declaratory judgment, which requires an "actual controversy". 28 U.S.C. § 2201. As noted previously, plaintiff's real and tangible grievance—the suspension—can be rectified by nonjudicial means for the mere asking. All plaintiff and her parents need do is to assure the proper official that plaintiff will behave. However, throughout the trial it became troublingly apparent that plaintiff was more interested in winning an argument about constitutional law than in going back to school. The resolution of abstract constitutional debates and the rendering of advisory opinions is forbidden to federal courts. Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW DIRECTED TO PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL

On Monday, March 1, 1971, plaintiff filed a Motion for Injunction Pending Appeal, the effect of which would be to reinstate plaintiff in school, the Court having ruled from the bench following the hearing of February 22, 1971 that her complaint would be dismissed and the relief prayed for therein denied.

Long standing settings of criminal cases on its jury docket and defendant's counsel being in trial in another court, a hearing on such motion could not be held until 8:00 a. m. this day.

As plaintiff states the basis for her motion, her education has been interrupted by her suspension, and she will suffer immediate and irreparable injury therefrom *unless* she is granted an injunction pending appeal, (i) enjoining defendants from refusing to permit her to attend classes and to exercise all of the usual rights and privileges of students attending Jackson Intermediate School, and (ii) enjoining defendants from refusing to afford her a reasonable opportunity to complete and submit for academic credit such work as has been missed during the period of her suspension.

It is conceded by all parties that notwithstanding her suspension, plaintiff may return to school at such time as she and her parents shall have given assurances to the district superintendent, his assistant and her principal, that she will comply with the rules and regulations complained of until they finally should be held invalid by a court or repealed by the district. This condition is in accordance with the existing, uniformly applied, administrative practice of the school district for readmission to school of suspended students.

■■■■ To the extent that relief is sought by the motion, the relief sought has been readily available through nonjudicial means since the hearing of January 21. Defendants are not preventing plaintiff from being readmitted to school, attending classes or making up her work, or anything else made the basis for her motion. No proper occasion for the exercise of this Court's injunctive powers is presented. In view of the defendants' offer to readmit plaintiff upon perfectly reasonable conditions, it would be improper and unseemly for this Court to intrude in, frustrate and thus permit a student and his or her parents to bypass the due, orderly and established proce-

dures of the district for readmission of suspended students. Additionally, plaintiff has not proved that she would suffer irreparable injury if the Court should not issue the injunction sought, pending appeal.

Should plaintiff choose to return to school through the administrative procedure alluded to above, her counsel has expressed concern and urged that an appeal might be mooted. This spectre is insubstantial. An issue becomes moot when, as a result of intervening occurrences, there are no longer adverse parties with sufficient legal interests to maintain the litigation. Mootness may arise when, pending an appeal, an event occurs which renders it impossible for the appellate court to grant appellant any effectual relief whatever. Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895); 6A Moore's Federal Practice § 57.13.

As well as reinstatement, plaintiff prays in her complaint (i) that this Court enjoin enforcement or threatened enforcement by defendants of the regulations complained of; (ii) that defendants be enjoined from "maintaining any record, written or otherwise, official or unofficial, which reflects that the minor plaintiff was disciplined for the acts alleged"; and (iii) that a declaratory judgment of invalidity issue as to certain of defendants' rules, regulations and policies, the school dress code and disruption policies in particular. Even though plaintiff should elect to return to school on the conditions proffered by the defendants, the issues upon which the foregoing elements of plaintiff's prayer for relief are predicated would remain at issue and not be mooted.

The existence of the disciplinary record alone, with its subsisting "collateral consequences," cf. Carafas v. La Vallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), would give plaintiff a stake in appeal substantial enough to preclude mootness. This conclusion is supported by the recent per curiam decision of the Court of Appeals for this Circuit in Calbillo v. San Jacinto Junior College, 434 F.2d 609 (5th Cir. 1970).

For the reasons set out above, some of which are in the alternative, (i) defendant's Motion to Dismiss is granted, and (ii) plaintiff's Motion for Injunction Pending Appeal is denied. Concurrently herewith, the Court has prepared and filed its final judgment in this cause.

Appendix A

Supreme Court of the United States

October Term, 1970

| | |
|---|---|
| Chesley Karr, a minor, individually and John R. Karr, Individually and as next friend and Guardian ad litem on behalf of themselves and all others similarly situated,<br><br>v.<br><br>Clifford Schmidt, Principal of Coronado High School, et al. | On Motion to Vacate a Stay of Injunction Pending Appeal. |

[February 11, 1971]

Mr. Justice BLACK, Circuit Justice.

This "Emergency Motion to Vacate a Stay of Injunction Pending Appeal" has been presented to me as the Supreme Court Justice assigned to the Court of Appeals for the Fifth Circuit. The motion concerns rules adopted by the school authorities of El Paso, Texas, providing that school boys' hair must not "hang over the ears or the top of the collar of a standard dress shirt and must not obstruct vision." The rules also provide that boys will not be admitted to or allowed to remain in school unless their hair meets this standard. The United States District Court for the Western District of Texas, El Paso Division, held after hearings that this local student hair length rule violated the Due Process

568

and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and enjoined its enforcement, declining to suspend its injunction pending appeal. On motion of the school authorities, the Court of Appeals for the Fifth Circuit stayed and suspended the District Court's injunction and the student appellees have asked me to vacate the Court of Appeals' stay of the injunction. Should I vacate the stay the El Paso school authorities would remain subject to the District Court's injunction and would thereby be forbidden to enforce their local rule requiring public school students not to wear hair hanging over their collars or obstructing their visions.

I refuse to hold for myself that the federal courts have constitutional power to interfere in this way with the public school system operated by the States. And I furthermore refuse to predict that our Court will hold they have such power. It is true that we have held that this Court does have power under the Fourteenth Amendment to bar state public schools from discriminating against Negro students on account of their race but we did so by virtue of a direct, positive command in the Fourteenth Amendment, which, like the other Civil War Amendments, was primarily designed to outlaw racial discrimination by the States. There is no such direct, positive command about local school rules with reference to the length of hair state school students must have. And I cannot now predict this Court will hold that the more or less vague terms of either the Due Process or Equal Protection Clauses have robbed the States of their traditionally recognized power to run their school system in accordance with their own best judgment as to the appropriate length of hair for students.

The motion in this case is presented to me in a record of more than 50 pages, not counting a number of exhibits. The words used throughout the record such as "Emergency Motion" and "harassment" and "irreparable damages" are calculated to leave the impression that this case over the length of hair has created or is about to create a great national "crisis." I confess my inability to understand how anyone would thus classify this hair length case. The only thing about it that borders on the serious to me is the idea that anyone should think the Federal Constitution imposes on the United States courts the burden of supervising the length of hair that public school students should wear. The records of the federal courts, including ours, show a heavy burden of litigation in connection with cases of great importance—the kind of litigation our courts must be able to handle if they are to perform their responsibility to our society. Moreover, our Constitution has sought to distribute the powers of government in this Nation between the United States and the States. Surely the federal judiciary can perform no greater service to the Nation than to leave the States unhampered in the performance of their purely local affairs. Surely few policies can be thought of in which States are more capable of deciding than the length of the hair of school boys. There can, of course, be honest differences of opinion as to whether any government, state or federal, should as a matter of public policy regulate the length of haircuts, but it would be difficult to prove by reason, logic, or common sense that the federal judiciary is more competent to deal with hair length than are the local school authorities and state legislatures of all our 50 States. Perhaps if the courts will leave the States free to perform their own constitutional duties they will at least be able successfully to regulate the length of hair their public school students can wear.

Application denied.